Shell ESTRADA, et al., Appellants,

v.

POTOMAC ELECTRIC POWER
COMPANY, Appellee.

No. 84–44.

District of Columbia Court of Appeals.
Argued Feb. 12, 1985.
Decided March 13, 1985.

Michael Maggio, Washington, D.C., for appellants.

James P. Salmon, Upper Marlboro, Md. with whom Charles E. Channing, Upper Marlboro, Md., was on brief, for appellee.

Before NEWMAN, FERREN and ROGERS, Associate Judges.

PER CURIAM:

This case comes before us on appeal from the trial court's grant of summary judgment. We affirm the judgment for the reasons expressed in the appended opinion of the trial court, per the Honorable George Herbert Goodrich, filed November 28, 1983, which opinion is incorporated herein.

MEMORANDUM OPINION AND ORDER

*Facts:*

On July 31, 1979, at approximately 7:20 p.m., plaintiffs Shell Estrada, age 11, and Andrew Canter,* age 12, were severely burned by an electrical discharge inside defendant Potomac Electric and Power Company's (PEPCO) Wildecroft Substation at 6904 Riverdale Road, Lanham, Maryland. A third child, Timothy Irwin, age 13, who was at the scene, was unharmed.

The plaintiffs are both Maryland residents and live across the street from the Wildecroft substation. PEPCO, a public utility exclusively licensed to provide electrical service in the District of Columbia, a small portion of Arlington County, Virginia, and most of Montgomery County and Prince George's County, Maryland, is incorporated and maintains its corporate headquarters in the District.

On the day before the accident, Andrew and Timothy went to the substation to play. While aware of signs posted on the doors of the substation indicating the possibility of electrical shock, the boys entered the substation by removing an aluminum grate situated between the main building wall and the substation's decorative wall. They accomplished this by climbing upon a platform, pushing the grate open with a stick and unscrewing the screws that secured the grate. On this day, the boys only peeked inside the building and replaced the grate.

On the following morning, Andrew and Timothy again went to the substation, climbed up on the platform, removed the grate and entered the substation. After noticing several bees' nests, the boys exited

unharmed. Later that afternoon, around 4:30 p.m., PEPCO security conducted an inspection of the substation. The metal grating that had been dislodged by the boys was not discovered.

Later that evening, the boys invited plaintiff Estrada to join them to view the bees' nests. Shell, also aware of the danger sign on the door, entered the substation in the manner Andrew and Timothy had adopted, and with their assistance. Once inside, the boys approached a bees' nest, as they walked along an I-beam. As they began to exit, electricity was discharged from the adjacent transformers, severely burning Shell Estrada and Andrew Canter.

*Plaintiffs' Claim:*

Plaintiffs' cause of action is in three counts. *First,* the plaintiffs claim that PEPCO was negligent in the design and maintenance of the Wildecroft substation. *Second,* under the rubric of "attractive nuisance," plaintiffs assert that PEPCO created an unreasonable risk of serious bodily harm to the minor plaintiffs by failing to take the appropriate steps necessary to prevent the harm, when PEPCO knew or should have known that children were likely to play in or about the substation. *Finally,* plaintiffs' parents assert a derivative claim for the expenses incurred and companionship lost as a result of their children's injuries.

*Defendant's Claim:*

■■■■ PEPCO argues, and the plaintiffs concede, that application of Maryland law to the case at bar warrants summary disposition in defendant's favor.[1] The court

---

* [D.C.Ct.App. footnote: The Canter appeal has been dismissed for reasons unrelated to the merits.]

1. Both the District of Columbia and Maryland apply the general rule that trespassers may recover against landowners only for "intentional, wanton or willful injury...." *See Holland v. Baltimore and Ohio R.R. Co.,* 431 A.2d 597, 599 (D.C.1981) and *Murphy v. Baltimore Gas and Elec. Co.,* 290 Md. 186, 428 A.2d 459 (1981). Even this duty to abstain from willful or wan-

ton conduct does not arise unless the owner has actual, rather than merely constructive, knowledge of the trespasser's presence on the property and is cognizant that he is in danger of immediate rather than merely possible harm. *Duff v. United States,* 171 F.2d 846, 848–50 (4th Cir. 1949); *Carter v. Baltimore Gas and Elec. Co.,* 25 Md.App. 717, 724, 336 A.2d 790, 794 (1975). The District of Columbia, however, has accepted the attractive nuisance doctrine as defined in Section 339 of the Restatement (Second) of

agrees; and must undertake, therefore, the task of determining the appropriate law to be applied.[2]

*Court's Ruling:*

 Choice of law involves examination not simply of various state interests generally, but of their interests regarding the various distinct issues to be adjudicated. *In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333, 341 (D.D.C. 1983).[3] The issue *sub judice* is whether the District of Columbia or Maryland has the most substantial interest in determining the nature of defendant's obligation, as landowner, towards the minor plaintiffs; or more particularly, which jurisdiction should regulate how the defendant maintains its Maryland property.

Defendant argues that since the issue in this case is one dealing with conduct regulation, and particularly with conduct respecting the maintenance of land, Maryland, as situs of that property, has the primary interest in determining whether conduct within its borders constitutes a tort against the plaintiffs who are also residents of that state. *Cf. Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense,* 121 U.S.App.D.C. 338, 350 F.2d 468 (1965), *cert. denied,* 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966) (while the court recognized a District interest in Maryland residents, it found Maryland's interest primary, especially where Maryland would have denied recovery). Defendant submits that on these facts Maryland has the greater, if not only, interest in both the plaintiffs' welfare, and defendant's obligation; and has chosen, by virtue of its failure to adopt an "attractive nuisance" exception, to clearly define the duty of persons owning land in Maryland and not to impose upon them what Maryland courts consider to be "ill-advised" restraints upon use of land. *State v. Fidelity Warehouse Co.,* 176 Md. 341, 4 A.2d 739 (1939).[4]

Torts (1965). *See Holland v. B & O R.R. Co., supra; Eastburn v. Levin,* 72 U.S.App.D.C. 190, 113 F.2d 176 (1940); *McGettigan v. National Bank,* 115 U.S.App.D.C. 384, 320 F.2d 703, *cert. denied,* 375 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963). Maryland, meanwhile, has repeatedly rejected that doctrine. *See Murphy v. Baltimore Gas and Elec. Co., supra; State v. Fidelity Warehouse Co.,* 176 Md. 341, 4 A.2d 739 (1939); *Hicks v. Hitaffer,* 256 Md. 659, 261 A.2d 769 (1970). In view of plaintiffs' having alleged nothing more than ordinary negligence in Count I and attractive nuisance in Count II, and in the absence of allegations or proof claiming PEPCO to have had actual knowledge of the boys, whether plaintiffs state a claim devolves entirely upon resolution of choice-of-law. *See, e.g., Tucker v. PEPCO,* No. 76–0780 (D.D.C.1978).

2. Whether one characterizes this analysis in terms of "governmental interest" or "most significant relationship," it can safely be said that the District of Columbia has eschewed the inflexible approach of traditional choice-of-law analysis represented in tort cases by lex loci delicti. *Myers v. Gaither,* 232 A.2d 577 (D.C. 1967), *aff'd,* 131 U.S.App.D.C. 216, 404 F.2d 216 (1968); *Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense,* 121 U.S.App.D.C. 338, 350 F.2d 468 (1965), *cert. denied,* 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); *Carr v. Biomedical Applications of Washington, Inc.,* 366 A.2d 1089 (D.C.1976). This court agrees with the suggestion made by PEPCO, in its Supple-

mental Memorandum at page 11, that this court employ a governmental interest analysis but in so doing consider the four factors set forth in Section 145 of the Restatement (Second) of Conflicts (1971). In doing so this Court concurs with the observation made by Judge Joyce Green in *In re Air Crash Disaster,* 559 F.Supp. 333, 342 (D.D.C.1983), that "the state with the 'most significant relationship' should also be that whose policy would be advanced by application of [its] law."

3. At the outset the court finds that sufficient contacts exist with each jurisdiction to support, constitutionally, the application of either Maryland or District of Columbia law. *Cf. Allstate Ins. Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).

4. Defendant maintains that, in reality, no conflict of laws exists between the District and Maryland, by adopting, implicitly, an analysis forwarded by the eminent professor Dr. Brainerd Currie, *see* Currie, *The Disinterested Third State,* 28 LAW & CONTEMP.PROBS. 754, 756–58 (1963), and refined by others under principles of "comparative impairment," Baxter, *Choice of Law and the Federal System,* 16 STAN.L.REV. 1 (1963) and Horowitz, *The Law of Choice of Law in California—A Restatement,* 21 U.C.L.A.L.REV. 719, 748–58 (1974). *See, e.g., Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719, *cert. denied,* 429 U.S. 859, 97 S.Ct. 159,

The factual predicate underlying plaintiffs' claim that District of Columbia law should be applied includes the fact that while plaintiffs' injuries occurred in Maryland, *per se*, the incident took place within the Washington, D.C. metropolitan area. More significantly, however, plaintiffs assert, is the fact that the conduct causing plaintiffs' injuries occurred in the District.[5]

Plaintiffs' argument may be summarized as follows: Defendant PEPCO is a D.C. corporation with its corporate headquarters located in Washington, D.C. All policies and practices regarding the design, safety and security of the Wildecroft substation emanated from PEPCO offices and officials in the District. Therefore the District of Columbia has the most significant relationship with the manner in which its resident corporation conducts itself in the D.C. metropolitan area, warranting therefore the application of the attractive nuisance doctrine.[6] Further support for plaintiffs'

---

50 L.Ed.2d 136 (1976) (resolving what, at first glance, appear to be true conflicts). Defendant submits, by taking a more restrained interpretation of District policy, that the landowner's interests which the attractive nuisance doctrine seeks to regulate are only landowners in the District and challenges plaintiffs to point to any case where the doctrine has been given extraterritorial effect. (Undertaking defendant's challenge, this court's research has uncovered no case of a court applying the doctrine to land outside its jurisdiction.) Completing this analysis, defendant asserts that the application of District law to the facts at bar would clearly undermine well-established Maryland policy and permit its circumvention by plaintiffs whose only contact with the forum was their ability to obtain in personam jurisdiction over the defendant. In contrast, application of Maryland law would have little, if any, impact upon the District policy of safeguarding the interests of minors and holding owners of District property liable for the consequences of their negligence where it should have been foreseen, in the exercise of ordinary care, that harm would result therefrom to an infant trespasser whose presence should have been anticipated.

The court finds this method of analysis compelling and persuasive. At the same time, and cognizant of the distinctions to be drawn between this case and *Myers v. Gaither,* see discussion *infra,* the court cannot escape the peculiar reality that is the Washington metropolitan area and which led Judge Leventhal to observe with regard to the rule that car owners are proximately liable for the intervening acts of a car thief:

It is true that this compensatory policy has the greatest relevance to cases when the mishap occurs in the District and when District residents are plaintiffs. However, to confine the benefits of the *Ross* rule [*Ross v. Hartman, infra* ] to the territory ceded by the states of Maryland and Virginia to form the Nation's Capital would be to shun the present reality of the economically and socially integrated greater metropolitan area. It is a commonplace that residents of Maryland are part of the Washington metropolitan trading area, and that District residents and businesses have an interest in the well-being of these citizens of the Free State. We can not fairly impute to Congress, or its delegate, the parochial intention to restrict recovery based on violation of the District regulation to District residents, especially taking into account the national constituency of Congress, in the absence of an express disclaimer.

*Gaither v. Myers,* 131 U.S.App.D.C. 216, 223, 404 F.2d 216, 223 (1968) (footnotes omitted).

Consequently, the court will continue its analysis assuming arguendo that a true conflict exists.

5. Defendant directs the court's attention to deposition testimony that reveals that the decision to install the metal grating, ultimately removed by the plaintiffs, was made at the site by a PEPCO field engineer. Determining precisely the place where the conduct causing the injury occurred, under the Restatement test, is not entirely free of difficulty in view of the construction ordinarily given to the word "cause." The court cannot ignore, even while accepting plaintiffs' account, that the minor plaintiffs' actions, too, were a cause-in-fact of their injury and occurred exclusively in Maryland.

6. Plaintiffs attempt to de-emphasize the import of the situs of their injury as an element in the conflicts "calculus" by characterizing PEPCO as a ubiquitous entity, acting with regard to the District, Maryland and Virginia not independently of one another, but rather as a unit. Plaintiffs note, for example, that rate decisions are, in fact, made on a systemwide basis. The testimony of Mr. Lederer, discussed *infra,* supports this characterization. Plaintiffs procced then to assert that the place where the parties' relationship is centered, *see* Restatement (Second) of Conflicts § 145(2)(d) (1971), must be the District, where PEPCO's headquarters are located. Accepting plaintiffs' proposition, the court is struck by the fortuity of defendant's state of incorporation, and more so as to where it chose to locate its headquarters. Plaintiffs'

claim that the District has the most significant relationship comes in the form of deposition testimony by Mr. Brian Lederer, at that time People's Counsel for the District of Columbia charged with representing ratepayers before the Public Service Commission, D.C.Code § 43–406 (1981). Plaintiffs' account of Mr. Lederer's testimony begins by noting that D.C. ratepayers have a significant interest in the tort liability of PEPCO.[7] Plaintiffs then offer the following theory to escape what would, at first blush, be the more obvious conclusion to be drawn from that proposition, namely that ratepayers would be better off if Maryland law is applied: If PEPCO is forced to conform to the standards of conduct reflected by the District's attractive nuisance doctrine, it will be compelled to make changes in its maintenance and security policies throughout its service area, the results of which will be to reduce the likelihood of injuries to children, thereby decreasing tort liability in the long run and reducing rates. Noticeably absent from Mr. Lederer's testimony, however, is any reference to differences between defendant's D.C. facilities and its Maryland ones with regard to safety-related components, or, for that matter, evidence that D.C. has suffered fewer instances of child injury than has Maryland which might be attributable to the "higher" standard required by the District. The court is not persuaded that its decision as to which jurisdiction has the most significant relationship to the issue of whether defendant's conduct constitutes negligence is to be determined by reference to what amounts to mere speculation on the potential impact of its ruling. *Compare Myers v. Gaither*, 232 A.2d 577, 584 n. 8 (D.C. 1967), *aff'd*, 131 U.S.App.D.C. 216, 404 F.2d 216 (1968) (where court notes that 5000 automobiles are stolen each year in the District and in almost 20%, car keys are left in the autos stolen: facts which lent support to the court's findings that D.C. interests would be significantly advanced by application of its law to an accident occurring in Maryland). Plaintiffs rely principally upon *Myers v. Gaither, supra,* and its application of D.C. law for the benefit of a Maryland resident in the case of an automobile accident occurring in Maryland.

In *Myers*, appellant appealed from an order of the trial court directing a verdict in favor of defendant. Appellant claimed, *inter alia*, that appellee, in violation of a District traffic regulation, had left his car keys in his vehicle, that this violation was negligence which permitted someone to steal the car and that appellee was therefore liable for the consequences of his omission.

The trial judge refused to admit the regulation on the ground that it was not supported by the evidence. In reviewing this ruling, the Court of Municipal Appeals noted that a conflict existed between Maryland and the District regarding the impact on a tort feasor's liability of the interven-

theory places almost controlling weight upon the situs of PEPCO's decisions regarding the design and maintenance of Wildecroft because by doing so contacts (b), (c) and (d) of the Restatement's test ostensibly fall in the District, and *a fortiori*, D.C. would have the most significant interest in applying the plaintiff-protective, conduct-regulatory policies reflected by the attractive nuisance doctrine. (The court does not mean to impute that plaintiffs merely "cumulated the contacts." All parties and the court are aware that the analysis is a decidedly qualitative one, as well, demanding a determination as to which jurisdiction, because of which contact, has the most significant relationship to the parties and the occurrence so as to warrant application of its law to the issue under consideration.) According to plaintiffs' theory, should defendant have located its headquarters elsewhere, Mary-

land, for example, a different result would necessarily follow. The court is not convinced that its decision as to which jurisdiction has the most significant relationship should hinge upon this particular circumstance. The court also cannot fail to note that the interests (in safety and low rates) that plaintiffs attempt to assert on behalf of area residents could be undermined should the rule they espouse be adopted.

7. An interest commonly referred to by courts engaging in modern choice of law analysis is a jurisdiction's interest in its resident upon whom a judgment may fall. *See, e.g., Hitchcock v. United States*, 214 U.S.App.D.C. 198, 665 F.2d 354 (1981). In view of PEPCO's ratemaking on a system-wide basis, both Maryland and the District share this concern.

ing acts of a thief. In Maryland, the theft was considered a supervening intervening cause barring the tortfeasor's liability; while in the District, auto theft was merely a dependent intervening cause and would not preclude liability. Consequently, the court noted that if Maryland law applied, the decision of the trial court would be upheld, albeit on different grounds. After discussing the Restatement (Second) of Conflicts' "most significant relationship" test, the court found:

> The high incidence of auto thefts in the District of Columbia, the constant warnings to the public to remove keys to prevent such thefts, the frequency of high speed chases involving stolen motor vehicles, all persuade us that the District has an overriding interest in preventing such occurrences and in encouraging owners to exercise greater caution in parking their automobiles. The only contacts this case discloses which are purely Maryland are the domicile of the appellant and the location of the accident—referred to in the *Kilberg case [Kilberg v. Northeast Airlines, Inc.,* 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961)] as merely "fortuitous"; while the District's contacts are domicile of the appellee, the situs of the original or primary negligence, the chosen forum, and the overriding public interest in proscribing the conduct here alleged—which contacts are indeed superior to those of any other jurisdiction. We hold that the District of Columbia law on questions of negligence

and proximate cause should be applied in this case.

232 A.2d at 584.

This court finds, however, that the factual underpinnings and policies advanced by the *Myers* decision are materially distinguishable from those of the case at bar and warrant that a different result be reached.

*Myers* concerned rules respecting, perhaps, the most mobile of possessions—an automobile. The legislative facts underlying this jurisdiction's adoption of an ignition key law, as well as the court's reasoning for holding that an intervening act of auto theft will not bar liability, *see Ross v. Hartman,* 78 U.S.App.D.C. 217, 139 F.2d 14 (1943), *cert. denied,* 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944); *see also Gaither v. Myers,* 131 U.S.App.D.C. 216, 222, 404 F.2d 216, 222 (1968), are set forth in that decision and represent an awareness by the respective courts that if the policies reflected by those rules were to have the impact intended, liability for failure to conform with them could not be based merely upon the law of the place of the accident—the situs of which the court characterized as wholly fortuitous.

In the instant case, however, we are concerned with rules respecting the most stable of possessions—land. In contrast to *Myers,* the consequences engendered by a landowner's care, or lack thereof, in maintaining his property can impact only within the jurisdiction that is the situs of the property. *See, e.g., In re Silver Bridge Disaster Litigation,* 381 F.Supp. 931 (S.D. W.Va.1974);[8] *Casey v. Manson Construc-*

---

**8.** *Silver Bridge* concerned claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346 (1982), arising out of the collapse of the Silver Bridge that had spanned the Ohio River between West Virginia and Ohio. Plaintiffs based their claims against the United States upon, *inter alia,* federal approval of the bridge's design and construction. In addition, the plaintiffs asserted that a local West Virginia district engineer without authority unlawfully and negligently permitted deviation from the approved plans.

In its choice of law analysis, the *Silver Bridge* court was governed by § 1346 of the FTCA requiring that tort liability be determined "in

accordance with the law of the place where the act or omission occurred." That court's construction of § 1346(b) is wholly inapplicable to the case at bar. In fact, the court's choice of law decision devolved into one between Ohio and West Virginia as a result of its understanding of Congress' intent not to have the tortious acts of government employees measured by a single standard that would result should plaintiffs' theory as to the locus of the acts or omissions, in the form of government approval in Washington, be adopted.

Notwithstanding, and without confinement by the FTCA, this court finds the *Silver Bridge* court's observation sound: Since all acts pre-

*tion and Engineering Co.,* 247 Or. 274, 428 P.2d 898 (1967). Although defendant, in the case at bar, approved the design and maintenance policies regarding the Wildecroft substation from its Washington headquarters, the alleged misfeasance "predictably impacted" at the place where the Wildecroft substation was located, *Silver Bridge,* 381 F.Supp. at 946, *see also Williams v. Williams,* 390 A.2d 4 (D.C.1978), and in the court's opinion points clearly to Maryland as the most interested state.[9]

■ This court does not dispute the fact that the District of Columbia has an interest in the manner in which its resident corporations conduct themselves outside our narrow boundaries as well as in the health and well-being of the citizens of the other states that comprise the Washington metropolitan area; nevertheless, this court's task is not to find that the District has *an* interest in the application of its law, but rather which jurisdiction has the *most substantial interest* in having its law applied to the issue of whether defendant's conduct entitles plaintiffs to compensatory damages.

dictably impacted in either Ohio or West Virginia and whereas eight of plaintiffs' decedents resided in Ohio and four in West Virginia, those jurisdictions were found to have the most substantial interest in applying their tort law to the issue of whether defendants were negligent.

9. In *Williams,* the Court of Appeals reversed the trial court's application of a D.C. law which required a spouse to convey her interest to certain real property located in Maryland to her husband. The court found that the wife, fraudulently and with the sole purpose of obtaining an interest in the marital abode, had pressed her husband into selling their Washington residence and purchasing a Maryland one upon which event she deserted her husband and returned to the District. Under Maryland law acquisition of property as tenants by the entirety created an absolute gift of a one-half interest in the non-paying spouse. The District, on the other hand, made the acquisition of such property a gift conditioned upon fulfillment of the marital vows and continuance of the married state. In resolving the clear conflict between Maryland and D.C. law, the Court of Appeals ruled:

> The District can have scant interest in insisting upon the application of its policy toward an innocent purchaser spouse to protect a

■ In view of the fact that this case concerns Maryland plaintiffs, asserting a claim for injuries incurred in Maryland as a result of the alleged negligent maintenance of real property by an entity who is present and doing business in both Washington and Maryland, the court finds that Maryland has the most substantial interest in applying its law to whether defendant's conduct constitutes an actionable injury.

*Maryland resident* when Maryland real property will be affected and that state has expressed such a strong interest in land title stability and would not protect the innocent spouse. Since "the only relationship of the District of Columbia to this claim is that it provides a forum with jurisdiction over [appellant,] [t]hat is hardly a reason for the forum to prefer its own notions of policy to those embodied in the [Maryland] law...." *Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense, supra,* 121 U.S.App.D.C. at 346–47, 350 F.2d at 476–77. We hold that Maryland law should have been applied by the trial court to the resolution of the interest in Maryland real estate between the parties. 390 A.2d at 6 (emphasis in original). While the case at bar concerns the maintenance of real property, as opposed to determining interests therein, *Williams* represents a refusal by the court to apply the ameliorating provisions of District law for the benefit of a Maryland plaintiff, the result of which would be to affect Maryland land and where Maryland policy is decidedly strong to the contrary. The plaintiffs' argument, in the instant case, would have this court adopt the position rejected in *Williams.*