HERCULES & COMPANY,
LTD., Appellant,

v.

SHAMA RESTAURANT
CORPORATION, et al.,
Appellees.

No. 87–1212.

District of Columbia Court of Appeals.

Argued March 29, 1989.
Decided Nov. 13, 1989.

---

Steven J. Kramer, with whom Martin F. McMahon and Cynthia L. Clark were on the brief, for appellant.

Donna S. McCaffrey, with whom John B. Tieder, Jr. was on the brief, for appellee Shama Restaurant Corp.

Warrick R. Furr, II, with whom Kenneth M. Willner was on the brief, for appellees Darrell Downing Rippeteau Architects, and Darrell Downing Rippeteau.

Before NEWMAN, BELSON, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

## I

### THE CONTROVERSY

This case requires us to explore the "Byzantine peculiarities" of the law of appellate jurisdiction over arbitration orders, *see New England Power Co. v. Asiatic Petroleum Corp.,* 456 F.2d 183, 189 (1st Cir. 1972), and leads us through "the wilderness in which courts sometimes find themselves when searching for solutions to problems arising under the judicial nightmare known as Conflict of Laws." *Forsyth v. Cessna Aircraft Co.,* 520 F.2d 608, 609 (9th Cir.1975). Its genesis was a dispute over a construction project in Old Town, Alexandria, which went awry. Appellant Hercules & Co., Ltd. (Hercules) eventually walked off the job, claiming that appellees Shama Restaurant Corp. (Shama), for whom the work was being done,[1] and Darrell Downing Rippeteau (Rippeteau),[2] Shama's architect, had defrauded Hercules and had made it impossible for Hercules to perform. The predictable mutual recriminations which often accompany such events were followed inexorably by the inevitable lawsuit which is now before us.

In its comprehensive amended complaint, which consists of fifteen separate counts and 174 paragraphs, Hercules seeks $1,750,000 in compensatory and punitive damages against Shama and Rippeteau, together with costs, counsel fees and incidental equitable relief. Hercules' claims against Shama include fraudulent inducement of the agreement in general and of the clause in the agreement requiring arbitration of disputes in particular. Shama is also charged with negligent misrepresentation, conventional and anticipatory breach of contract, negligent selection of an agent (Rippeteau) and vicarious liability for Rippeteau's alleged wrongful acts. The principal claims against Rippeteau are fraud, negligent misrepresentation, breach of implied warranty, and negligence.

The facts, as alleged in the Amended Complaint, can be briefly summarized as follows. Hercules is a Washington, D.C. construction company which specializes in restoration work. Hercules alleges that in 1985 Rippeteau was the architect in the proposed restoration of a church complex located on Church Street in northwest Washington. Hercules was interested in participating in the Church Street project. Rippeteau allegedly represented to Hercules that if Hercules wished to bid on the Church Street restoration, it should first bid on the renovation of a building in Alexandria for which Rippeteau was also the architect. This was the project for Shama. Hercules alleges that it bid on the Alexandria project based on Rippeteau's representations that if it did so, it would later be afforded the opportunity to bid on the Church Street renovation.

---

1. Shama owns the well-known "Le Gaulois" restaurant in northwest Washington.

2. Rippeteau's firm is called Darrell Downing Rippeteau, Architects (DDRA). Both were joined as defendants. For purposes of this opinion, we refer to Rippeteau and DDRA together as Rippeteau.

Hercules was the successful bidder on Shama's work in Alexandria. Having experienced problems on another job as a result of inadequate owner financing, Hercules sought assurances that Shama's resources were sufficient to complete the project. Hercules claims that several of Shama's agents, including Rippeteau, assured Hercules that its construction loan had been approved and that its funding was adequate. Hercules alleges that prior to signing the agreement, it requested deletion of the arbitration clause. Hercules was advised by Shama and Rippeteau, however, that the bank providing the financing would not allow any changes in the general conditions on the contract, which was on a form prescribed by the American Institute of Architects. On June 19, 1986, relying on assurances from Shama and Rippeteau that sufficient funds were available, Hercules finally signed the agreement as tendered.

Rippeteau was not a party to the Agreement, but was listed as the architect for the project. Paragraph 6 of the Agreement provides that the documents there enumerated "constitute the entire agreement between the Owner and the Contractor."

Hercules alleges that difficulties developed shortly after it signed the Agreement and began to work on the project. A human skeleton was discovered on the premises, and a homicide investigation ensued. Hercules encountered further problems, allegedly not of its own making, with soil conditions. Hercules claims that Rippeteau's plans were deficient, that change orders were necessary, and that Rippeteau did not process the change orders. Moreover, according to Hercules, officers of

Shama advised it that, contrary to the prior assurances which Hercules had received, Shama's funds were insufficient to complete the project. To add insult to injury, at least from its own perspective, Hercules discovered that bidding had closed on the Church Street project without Hercules having been offered an opportunity to compete. In February 1987, claiming that Shama and Rippeteau had destroyed its ability to perform its obligations under the Agreement, Hercules discontinued its work. Hercules filed this suit in the Superior Court the following month.

As previously noted, the contract between Hercules and Shama contained a broad arbitration clause. Shama promptly demanded that its dispute with Hercules be submitted to arbitration, and the issue of arbitrability came before Honorable Shellie Bowers. Concluding that Hercules' allegations of fraud in the inducement of the arbitration clause were insufficient as a matter of law, the trial judge stayed the proceedings and referred them to arbitration. He also dismissed several of the claims against Rippeteau, concluding that Virginia law applied and that under Virginia law these claims were not actionable. Although Rippeteau had not entered any agreement to arbitrate with Hercules, Judge Bowers referred the remaining claims against Rippeteau to the arbitration proceedings between Hercules and Shama.[3] Hercules has appealed from these orders.

We conclude that the referral of Hercules' dispute with Shama to arbitration is not an appealable order, and therefore dismiss that portion of the appeal. We further conclude that the trial judge erred in

---

**3.** While the stay was in effect, Hercules and Shama proceeded to arbitration. The arbitrators awarded Shama $150,015. There has to date been no confirmation of the award pursuant to Super.Ct.Civ.R. 70–I. Shama asks us to hold that the completion of the arbitration proceedings has mooted Hercules' appeal from the order directing that they take place. Shama says that Hercules can pursue its claim of fraud in the inducement when Shama asks the court to confirm the award.

We do not think the issue moot. Under Rule 70–I(b), a motion to confirm an arbitration award is a summary proceeding. Discovery is

available only by leave of court. Moreover, although fraud in the procurement of the *award* is one of the few defenses available, *see* 9 U.S.C. § 10(a), it is not at all clear, and we do not decide, whether fraud in the inducement of the *arbitration clause* itself is within the scope of such a summary proceeding. A motion to confirm the award is thus different in scope and character from a preliminary proceeding to set aside the arbitration clause for fraud. We must therefore reach the issue whether Judge Bowers' order granting a stay pending arbitration is appealable.

holding that Virginia law applies to certain of Hercules' claims. Accordingly, we vacate these portions of the order and remand for further proceedings.

## II

## APPEALABILITY

A. *The Shaky Edifice—Enelow-Ettelson and the Road to Brandon.*

■ Shama contends that Judge Bowers' order referring Hercules' claims against it to arbitration is not an appealable order. Hercules counters that this court has jurisdiction of the appeal from that referral because it is an "interlocutory order ... granting, continuing ... or dissolving or refusing to ... dissolve [an] injunction" within the meaning of D.C.Code § 11–721(a)(2)(A) (1989).[4] By not allowing the judicial proceeding to continue, says Hercules, the court is in effect enjoining its prosecution, to Hercules' irreparable injury. In light of *Brandon v. Hines*, 439 A.2d 496 (D.C.1981), and of recent developments in the applicable law, particularly *Gulfstream v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), this contention has become untenable.

■ This court's appellate jurisdiction is purely statutory. Before 1971, with a single exception not here pertinent, we had jurisdiction of appeals only from final orders and judgments. *Brandon, supra,* 439 A.2d at 502. In 1971, Congress enlarged our jurisdiction to include, among other things, appeals from interlocutory orders respecting injunctions. *Id.;* see § 11–721(a)(2)(A).[5]

*Brandon* is the only decision of this court which has addressed the applicability of the "injunction" statute to the grant or denial of a stay pending arbitration. We held in that case, however, that the Supreme Court's interpretation of the analogous federal statute[6] is "persuasive authority" in the construction of ours. 439 A.2d at 509. Before examining *Brandon* in detail, a few words about the development of the applicable federal law may be instructive.

For many years, pursuant to a line of much-criticized cases which exalted form over substance to a truly extraordinary degree, the federal courts resolved problems of the kind here presented by invoking the so-called *Enelow-Ettelson* doctrine.[7] These cases and their progeny, *see, e.g., Baltimore Contractors v. Bodinger,* 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955), stood for the proposition that a grant or denial of a stay for the determination of an equitable defense was immediately appealable if the underlying action was at law, but not if the suit was in equity. As Judge Altimari retrospectively explained for the court in *Steele v. L.F. Rothschild & Co., Inc.,* 864 F.2d 1, 2 (2d Cir.1988):

> Simply stated, the *Enelow-Ettelson* doctrine adopted the legal fiction that because an order from a chancellor staying an action at law traditionally took the form of an injunction, a stay based upon an equitable defense, *e.g.,* the existence of an arbitration agreement, should be

---

4. This is the sole basis asserted by Hercules to support its position that the order is appealable. Hercules does not claim that the referral to arbitration is a final judgment. This is a correct assessment. *See Brandon v. Hines,* 439 A.2d 496, 504 (D.C.1981).

Hercules likewise places no reliance on the "collateral order" exception to the final judgment rule articulated in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In order to qualify for that exception, the order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment. *Cooper & Lybrand v. Livesay,* 437 U.S. 463, 468,

98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). An order staying an action pending arbitration does not satisfy the third of these requirements. *Commonwealth Ins. Co. v. Underwriters, Inc.,* 846 F.2d 196, 198 (3d Cir.1988).

5. Unless otherwise specified, all section references are to the District of Columbia Code, 1989 Replacement Volume.

6. 28 U.S.C. § 1292(a)(1).

7. *Enelow v. New York Life Ins. Co.,* 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935); *Ettelson v. Metropolitan Life Ins. Co.,* 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942).

treated as an injunction, even though the "chancellor" is, in fact, a law judge.

The *Enelow–Ettelson* doctrine had little relation to reality.[8] It was "divorced from any rational or coherent appeals policy." *Lee v. Ply Gem Industries, Inc.*, 193 U.S. App.D.C. 112, 115, 593 F.2d 1266, 1269 (D.C.Cir.), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). Nevertheless, in spite of the fact that it was universally criticized, *Gulfstream, supra*, 108 S.Ct. at 1142 n. 11; *Feldspar Trucking Co., Inc. v. Greater Atlanta Shippers Ass'n*, 849 F.2d 1389, 1391 (11th Cir.1988),[9] *Enelow–Ettelson* remained in effect for more than half a century after *Enelow* was decided.

In 1980, however, the Court, determined to temper the tendency of the doctrine to undercut the policy against piecemeal appeals, held that an order was not appealable pursuant to § 1292(a)(1) unless it had both the practical effect of granting or denying an injunction and "serious, perhaps irreparable consequences" which could be "effectively challenged" only by immediate appeal. *Carson v. American Brands*, 450 U.S. 79, 84, 101 S.Ct. 993, 997, 67 L.Ed.2d 59 (1981). This was the state of the law when *Brandon* was decided.

In *Brandon*, after an exhaustive analysis of the federal precedents, this court held, in accordance with *Enelow–Ettelson*, that a decision either to stay or not to stay a proceeding pending arbitration had the practical effect of granting or refusing an injunction. 439 A.2d at 506. Turning to the requirement in *Carson* of an injury sufficient to justify immediate appeal, the court concluded that

> denials—but not grants—of stays of litigation pending arbitration are appealable interlocutory orders, since only orders that frustrate (in contrast with facilitat[ing]) arbitration impose a sufficiently serious injury to justify an immediate appeal.

*Id.* at 507.

### B. *Gulfstream and its Progeny—The Collapse of a Legal Fiction.*

> You have stayed in this place too long, and there is no health in you. In the name of God, go![10]

So spoke Oliver Cromwell with commendable brevity in dismissing the Rump Parliament in 1658. Although Justice Marshall necessarily explained his decision in *Gulfstream* at somewhat greater length than the plain-spoken and supposedly "Right but Repulsive" Roundhead,[11] he wrote with equal eloquence for a unanimous Court when what he called the "sterile and antiquated"[12] *Enelow–Ettelson* doctrine was finally relegated to the historical oblivion which it so richly deserved. The Court held that, contrary to the assumption on which *Enelow–Ettelson* was predicated,

> an order by a federal court that relates only to the conduct or progress of litiga-

---

**8.** As Judge Clark said for the court almost half a century ago in *Beaunit Mills, Inc. v. Eday Fabric Sales Corp.*, 124 F.2d 563, 565 (2d Cir.1942), quoted in *Gulfstream, supra*, 108 S.Ct. at 1140:

> [w]e lack any rationale to explain the concept of a judge enjoining himself when he merely decides upon the method he will follow in trying the case. The metamorphosis of a law judge into a hostile chancellor on the other 'side' of the court could not have been overclear to the lay litigant under the divided procedure; but if now without even that fictitious sea change one judge in one form of action may split his judicial self at one instant into two mutually antagonistic parts, the litigant surely will think himself in Alice's Wonderland.

**9.** Among the characterizations which federal appellate courts have found appropriate for the Supreme Court's handiwork in *Enelow–Ettelson* are "a remnant from the jurisprudential attic," *Danford v. Schwabacher*, 488 F.2d 454, 456 (9th Cir.1973) and "an anachronism wrapped up in an atavism," *Hartford Financial Systems, Inc. v. Florida Software Services, Inc.*, 712 F.2d 724, 727 (1st Cir.1983); Professor Moore has called it a "wonderland." 9 Moore's Federal Practice ¶ 110–20[3], at 245 (2d ed. 1980).

**10.** Quoted in N. McPhee, The Book of Insults 115 (Penguin Books 1978).

**11.** *See* W. Sellar & R. Yeatman, 1066 and All That 63–64 (E.P. Dalton & Co.1931). In the civil war of Cromwell's day, according to the authors of this unorthodox history of England, the Roundheads were matched against the Cavaliers (Wrong but Wromantic).

**12.** 108 S.Ct. at 1142.

tion before that court ordinarily *is not considered an injunction* and therefore is not appealable under § 1292(a)(1).

108 S.Ct. at 1138 (emphasis added). The Court made it clear that § 1292(a)(1) would continue to provide appellate jurisdiction over those orders which really had the practical effect of granting or denying an injunction, provided that the appellant could make a showing of serious or irreparable consequences, as contemplated in *Carson.* The Court held, however, that a district judge's refusal to stay a suit before him because of the pendency in state court of an action presenting similar issues between the same parties did not satisfy these criteria; it did not involve an injunction, and the consequences were insufficiently severe. *Id.* 108 S.Ct. at 1142–43. Piecemeal appeals were no longer to be permitted pursuant to the fictitious notion that, under a system in which law and equity have been merged, a judge will be deemed to have issued or denied an injunction against himself if he stays or declines to stay proceedings before him.

Although *Gulfstream* related to the appealability of an order refusing to stay an action pending state court proceedings, rather than to await the results of arbitration, the two situations are obviously analogous. As a result, federal appellate courts have uniformly held since *Gulfstream* that neither the grant [13] nor the denial [14] of a stay pending arbitration is immediately appealable. Under *Gulfstream* and its progeny, an order granting or denying a stay pending arbitration is no longer viewed as having the practical effect of an injunction or denial thereof. Similarly, in light of these authorities, a party's obligation to arbitrate or to proceed with the litigation no longer constitutes a sufficient injury to support an interlocutory appeal.

In *Rauscher Pierce Refsnes, Inc. v. Birenbaum,* 860 F.2d 169 (5th Cir.1988), for example, the court explicated the effect of *Gulfstream* as follows:

> Appellant argues that the district court's order is appealable because the denial of a stay of proceedings pending arbitration has the same practical effect as the denial of an injunction. This reading of the *Gulfstream* case would revive the *Enelow–Ettelson* doctrine under another name and flatly contradict the Supreme Court's holding that stays "are not automatically appealable under § 1292(a)(1)."

> *        *        *        *        *        *

> Thus an order termed an "injunction" that functions merely as a stay of proceedings within the court issuing it is not appealable. *Hamilton v. Robertson,* 854 F.2d 740 (5th Cir.1988).

*Id.* at 171.

In *Crist v. Miller,* 846 F.2d 1143 (7th Cir.1988) (Posner, J.), the court held that, under *Gulfstream,* the denial of a stay pending arbitration is not appealable, for the requirement that a party litigate in court, when he claims to be entitled to arbitrate instead, does not constitute the kind of harm justifying immediate appeal:

> If it turns out that the appellants had a valid contractual right to arbitrate the claims, the judgment will be set aside and the matter referred to arbitration. There will be waste motion, no doubt, but that is always true when a sound defense interposed early in a litigation is erroneously rejected. It is the price we pay for having a final-judgment rule. The exceptions to the rule are narrow, and do not include mere inconvenience to a party wanting to take an interlocutory appeal. The ordinary incidents of litigation—the

---

13. *E.g., DeFuertes v. Drexel, Burnham, Lambert, Inc.,* 855 F.2d 10, 11 (1st Cir.1988); *Steele v. L.F. Rothschild & Co., Inc., supra,* 864 F.2d at 1; *Commonwealth Ins. Co. v. Underwriters, Inc.,* 846 F.2d 196, 197–98 (3d Cir.1988); *Zosky v. Boyer,* 856 F.2d 554 (3d Cir.1988); *Jolley v. Paine Webber Jackson & Curtis, Inc.,* 864 F.2d 402, 403–04 (5th Cir.1989).

14. *E.g., McDonnell Douglas Finance Corp. v. Pa. Power & Co.,* 858 F.2d 825, 829 (2d Cir.1988); *Delta Traffic Service v. Occidental Chemical Corp.,* 846 F.2d 911, 914–16 (3d Cir.1988); *Rauscher Pierce Refsnes, Inc. v. Birenbaum,* 860 F.2d 169, 171 (5th Cir.1988); *Crist v. Miller,* 846 F.2d 1143, 1144–45 (7th Cir.1988); *Feldspar Trucking Co., Inc. v. Greater Atlanta Shippers Assoc., Inc.,* 849 F.2d 1389, 1391–92 (11th Cir. 1988).

time and other resources consumed—do not constitute irreparable harm.

*Id.* at 1144.

This is true, *a fortiori*, where a stay has been granted, and where the appellant's only claimed injury is that he is improperly being required to arbitrate when he believes that he has the right to litigate in court. *See, e.g., DeFuertes v. Drexel, Burham, Lambert, Inc.*, 855 F.2d 10, 12 (1st Cir.1988) ("if plaintiffs are correct that no valid arbitration agreement existed, then the denial of immediate review will have required them to have incurred the expense of arbitration proceedings, but this ... is the price of the final judgment rule and does not constitute irreparable harm"). Moreover, as the court correctly stated in *Zosky v. Boyer*, 856 F.2d 554, 561 (3d Cir. 1988)

> Arbitration is an expeditious and inexpensive mode of alternative dispute resolution. Allowing interlocutory appeals of such orders would defeat the attractiveness of arbitration by imposing delay and additional expense.

In light of these decisions, we conclude that if this case were being litigated in a federal court, Judge Bowers' order referring Hercules and Shama to arbitration would not be subject to interlocutory appeal pursuant to § 1292(a)(1).

C. *Where the District Stands Now: Gulfstream, Brandon, and Notions of Federalism.*

If *Brandon v. Hines* were being decided today, its result might well be different. The conclusion in *Brandon* that the denial of a stay had the practical effect of an injunction presents grave difficulties in light of the language in *Gulfstream* and *Birenbaum* quoted at pp. 36, 37, *supra*. The notion that the obligation to arbitrate or litigate is a sufficient injury has been undermined by the cases cited in n. 13 and n. 14, *supra* and, for all practical purposes, by *Gulfstream* itself. Since *Brandon* relied heavily on the federal decisions

which predated it, the court would probably have been guided by *Gulfstream* as well, had it been decided prior to *Brandon*.

As a division of this court, however, we are not free to reexamine *Brandon*. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). Although, as *Brandon* itself recognized, the District's interlocutory appeal statute is very similar to its federal counterpart, it is not the same Act. Accordingly, we are not at liberty to hold that *Gulfstream* has overruled *Brandon* on any issue. In fact, in the absence of the most extraordinary circumstances, the Supreme Court will not challenge an interpretation by this court of District of Columbia law. *Pernell v. Southall Realty*, 416 U.S. 363, 368, 94 S.Ct. 1723, 1726, 40 L.Ed.2d 198 (1974). "On a question of purely local law, this court is undeniably the final arbiter." *Meiggs v. Associate Builders, Inc.*, 545 A.2d 631, 633 (D.C.1988). Even though its holding that the denial of a stay constitutes an order dissolving an injunction was seemingly based on the now abandoned *Enelow–Ettelson* doctrine, *Brandon* will remain the law of the District of Columbia unless and until it is reconsidered *en banc* or modified by statute. *Meiggs, supra*.[15]

Read as a whole, however, *Brandon* does not support our jurisdiction over this appeal. As we have noted at p. 36, *supra*, the court in *Brandon* distinguished between an order denying a stay pending arbitration, which it held to be reviewable on interlocutory appeal, and an order granting such a stay, as to which the court reached the opposite conclusion. Although the appealability of a grant of a stay was not before the court, there is support in *Brandon*, albeit in *dictum*, for the conclusion that Judge Bowers' order is not subject to review pursuant to § 11–721(a)(2)(A).

Although, contrary to *Brandon*, recent federal case law precludes this type of interlocutory appeal *both* where a stay has been granted *and* where it has been de-

---

**15.** This court, sitting *en banc*, relied in part on *Brandon* in holding that a protective order in a landlord-tenant case is appealable as an order granting an injunction. *McQueen v. Lustine Realty Co.*, 547 A.2d 172, 178 (D.C.1988) (*en banc*).

nied, the distinction articulated in *Brandon* between these two situations finds substantial support in other pre-*Gulfstream* authority. *See, e.g., Stateside Machinery Co. Ltd. v. Alperin,* 526 F.2d 480, 482 (3d Cir. 1975); *Buffler v. Electronic Computer Programming Inst., Inc.,* 466 F.2d 694, 698–99 (6th Cir.1972); *New England Power Co. v. Asiatic Petroleum Corp.,* 456 F.2d 183, 186 (1st Cir.1972). As Judge Coffin wrote for the court in *New England Power Co., supra,*

> It is one thing to hold, as we have [citations omitted], that an order enjoining arbitration is appealable, but quite another to hold that a refusal to so order may be immediately reviewed on motion of one of the parties. A decision to stay impending arbitration may well be an injunction in the 'classic' sense since it effectively deprives at least one of the parties to the dispute of one of the principal objects for which he has contracted— that is, a relatively expeditious and inexpensive preliminary resolution of any controversy. *See* 9 MOORE'S FEDERAL PRACTICE ¶ 110.20[1] (2d ed. 1970). A refusal to stay arbitration, on the other hand, has no such potentially adverse impact on the ultimate rights of the parties.

Moreover, as the court explained in *Stateside Machinery Co., supra,* 526 F.2d at 483, "permitting the arbitration to proceed is not likely to have serious, perhaps irreparable consequences, because arbitration awards are not self-executing."

Although *Gulfstream* and the cases that follow it could not and did not change District law as announced in *Brandon,* they surely counsel us not to expand the scope of what may be appealed on a piecemeal

basis beyond what *Brandon* requires. Being unable as a division to adopt *Gulfstream* in its entirety, we follow the *dictum* in *Brandon,* which is consistent with *Gulfstream,* and dismiss this portion of the appeal.

### D. *The Charge of Fraud in the Inducement.*

█ Our analysis is not altered by Hercules' allegation of fraud in the inducement of the Agreement and of its arbitration clause. We recognize that "if there is a claim of fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the ... court may proceed to adjudicate it." *Prima Paint v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967); *see also Moseley v. Electronic & Missile Facilities, Inc.,* 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963). We are also mindful of the fact that, if the claim of fraud were to be established with respect to the arbitration clause itself, then there would be no valid agreement to arbitrate, and the policies favoring arbitration would not apply.

█ The trial judge, however, held the pleading of the claim of fraud in the inducement of the arbitration clause insufficient. He based his referral to arbitration on that determination. Since the *consequence* of his assessment of the pleading was an order staying the case pending arbitration, and since such an order is not appealable on an interlocutory basis either under *Gulfstream* or under *Brandon,* the fact that Hercules grounded its attack on a claim of fraud is immaterial.[16]

---

**16.** Since Judge Bowers' order is not appealable, we do not reach its merits. We note, however, that fraud is never presumed, and must be alleged with particularity and proved by clear and convincing evidence. *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). The party claiming to have been defrauded must prove, among other things, not only that he relied on a false representation, but also that his reliance was reasonable. *Baker v. Baker,* 54 App.D.C. 214, 217, 296 F. 961, 964 (1924); *One-O-One Enterprises, Inc. v. Caruso,* 668 F.Supp.

693 (D.D.C.1987), *aff'd,* 270 U.S.App.D.C. 251, 848 F.2d 1283 (1988). At least in a commercial context, reliance on representations made by the other party during negotiations has been held unreasonable as a matter of law where these representations have not been included in the executed agreement which by its terms is the entire contract between the parties. *One-O-One Enterprises, supra,* 668 F.Supp. at 699.

By Hercules' own description of events, it sought modifications of the Agreement but was advised that it could not have them. Presumably, Hercules wanted the arbitration clause

## III

## CHOICE OF LAW

### A. *General Considerations.*

Hercules alleges that its bid on the Virginia project was induced by Rippeteau's false representations. Hercules also claims that Rippeteau failed to issue written change orders at the site and breached an implied warranty of plans and specifications. The trial judge concluded that all of the claims against Rippeteau should be decided under Virginia law because the project was located in Virginia, and because Virginia had the most significant contacts with the transaction. Applying Virginia law, Judge Bowers dismissed some of the claims against Rippeteau and referred the others to arbitration. On appeal,[17] Hercules contends that District of Columbia law applies, characterizing the dispute as one between two District businesses arising out of negotiations which took place in the District.

"The courts have long recognized that they are not bound to decide all issues under the local law of a single state." Restatement (Second) of Conflict of Laws § 145, Comment d. (1971 and and Supp. 1988) (hereinafter the Restatement); *see also Estrada v. Potomac Elec. Power Co.,* 488 A.2d 1359, 1361 (D.C.1985) ("choice of law involves examination not simply of various state interests generally, but of their interest regarding the various distinct issues to be adjudicated"). We hold that the trial judge correctly applied Virginia law to those claims—negligence and breach of implied warranty—which arise out of Rippeteau's alleged breach of his duty as an architect on the project in Virginia. We conclude, however, that District law applies to the claims of fraud and negligent misrepresentation against Rippeteau.

■ Hercules and Rippeteau have significant connections both with Virginia and with the District of Columbia. There are sufficient contacts with both jurisdictions to support, constitutionally, the application of either District or Virginia law. *See Allstate Insurance Co. v. Hague,* 449 U.S. 302, 308–09, 101 S.Ct. 633, 637–38, 66 L.Ed.2d 521 (1981); *Home Ins. Co. v. Dick,* 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). The construction project, which is at least one focal point of the relationship between Hercules and Rippeteau, is in Virginia. The allegedly false representations were primarily made in the District.

■ Judge Bowers' determination that Virginia law applies to all claims is not unreasonable on its face, and might arguably be sustained if our review were for abuse of discretion. Questions of choice of law are, however, generally treated as issues of law subject to *de novo* review by the appellate court. *See Bailey v. Dolphin International, Inc.,* 697 F.2d 1268, 1274 (5th Cir.1983).

In determining which law governs the dispute, this court has used the "governmental interests analysis." *Kaiser-Georgetown Community v. Stutsman,* 491 A.2d 502, 509 (D.C.1985). In applying that analysis, we also consider the factors enumerated in the Restatement, § 145, *Estrada, supra,* 488 A.2d at 1361 n. 2, to assist in identifying the jurisdiction with the

---

out, but it is in. Hercules would have liked assurances of Shama's fiscal soundness in, but they are out. Paragraph 6 explicitly states that the documents there enumerated constitute the entire agreement of the parties.

Under these circumstances, the road for Hercules on the reasonable reliance issue cannot be an easy one. As Judge Bowers pithily put it, "the one that really hangs me up is reasonable reliance." We do not prejudge whether Hercules can meet this substantial burden. Alleging fraud (insufficiently, in Judge Bowers' view) is one thing, however, and proving it is quite another. On these facts, it is not unfair to Hercules to apply the principles of *Gulfstream* and the *dictum* in *Brandon,* and to defer any appeal

with respect to the issue of arbitrability until after a final judgment has been entered.

17. Hercules' appeal from this aspect of Judge Bowers' order was subject to dismissal, as the order did not dispose of the entire case. After argument, we ordered Hercules to show cause why this portion of the appeal should not be dismissed, but indicated that dismissal would not be necessary if the trial judge issued an order pursuant to Super.Ct.Civ.R. 54(b) directing the entry of final judgment as to the claims in question. On Hercules' application, Judge Bowers issued such an order, and we now have jurisdiction over this portion of the appeal.

"most significant relationship" to the dispute.[18]

Under the governmental interests analysis as so refined, we must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Stutsman, supra,* 491 A.2d at 509, quoting *Williams v. Williams,* 390 A.2d 4, 5–6 (D.C.1978). Because the counts alleging negligence and breach of warranty by the architect involve different governmental interests from those alleging misrepresentation, we address each of these categories separately.

A. *The Negligence and Implied Warranty Claims.*

In Virginia, a contractor cannot maintain an action against an architect for economic loss in the absence of privity of contract. *Blake Construction Co. Inc. v. Alley,* 233 Va. 31, 353 S.E.2d 724 (1987). As the court explained in *Alley,*

> [t]he parties involved in a construction project resort to contracts and contract law to protect their economic expectations. Their respective rights and duties are defined by the various contracts they enter. Protection against economic losses caused by another's failure properly to perform is but one provision the contractor may require in striking his bargain.

*Id.* 353 S.E.2d at 727. Although no decision of this court on the issue has been cited to us, and we are aware of none, the absence of privity of contract is not deemed conclusive in some jurisdictions. *See* ANNOTATION: *Tort Liability of Project Architect for Economic Damages Suffered by Contractor,* 65 A.L.R.3d 249, 256–61 (1975 and Supp.1988), for a discussion of cases not

requiring privity.[19] But even assuming, *arguendo,* that our courts would not follow the Virginia rule, we find Virginia's interest more compelling than the District's.

Rippeteau is listed as the project architect on the Agreement between Hercules and Shama, but is not a party to it. Paragraph 13.1 of that Agreement expressly provides that "the Contract shall be governed by the law of the place where the project is located," here Virginia. Under these circumstances, Rippeteau could reasonably expect that, in the absence of a contractual relationship with the contractor on a project in Virginia, it would not be liable for a contractor's economic losses. Virginia has a substantial interest in protecting that expectation, and in retaining the authority to prescribe the rules which govern the performance by architects of their obligations and warranties on projects within the State. As Judge Bowers observed below:

> It would appear to me that the state having the more compelling interest in the resolution of this dispute would be Virginia. Clearly you're talking about whether people are going to go amicably about putting up a building in the state of Virginia. If as a result of shoddy work the building doesn't—performance is shoddy, therefore the building is not in the shape it should be in, Virginia has the interest in remedying that.

Although the District arguably has an interest in assuring that its architects perform according to industry standard, this interest is attenuated where, as here, the plans at issue are for a building in Virginia.

The Restatement leads us to the same conclusion. Section 145 enumerates four considerations which may guide courts in choice of law decisions relating to tortious conduct:

18. The "governmental interest analysis" and the "most significant relationship" test have sometimes been treated as separate approaches to conflict of law questions. *See* ROBERT R. LEFLAR, AMERICAN CONFLICTS LAW, §§ 135, 136 (3d ed. 1977). We have, however, applied a constructive blending of the two approaches. *Estrada, supra,* 488 A.2d at 1361 n. 2. "In doing so this court concurs with the observation, made by

Judge Joyce Green" in *In re Air Crash Disaster,* 559 F.Supp. 333, 342 (D.D.C.1983), that "the state with the 'most significant relationship' should also be the state whose policy is advanced by application of [its] law." *Id.*

19. Our allusion to these authorities is not designed to suggest that we would or would not follow them.

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile[,] ... place of incorporation ... and place of business of the parties; and

(d) the place where the relationship is centered.

We consider each of these factors in turn.

The injury of which Hercules complains in relation to the negligence and implied warranty claims occurred, at least for the most part, in Virginia. It was there that Hercules allegedly tried to carry out the building plans which it characterizes as defective. It was in Virginia that Hercules asserts that it was unable to persuade Rippeteau to process the necessary change orders.

To be sure, Hercules is a District of Columbia corporation. It alleges that it suffered pecuniary loss in its place of business. In cases of economic loss, however, the place of injury does not play as important a role for choice of law purposes as it does where personal injury is alleged. Restatement § 145, comment f.

Most of the conduct by Rippeteau from which Hercules claims to have suffered injury likewise occurred in Virginia. Although the plans for the project were prepared in Washington, the implied warranty was not effectively breached until it allegedly became apparent that the plans were not adequate and Rippeteau failed to make the necessary changes. It was in Virginia that Rippeteau could have corrected the alleged deficiencies upon Hercules' request.

Hercules and Rippeteau are both domiciled in the District. Although this might under some circumstances be a significant factor in favor of applying District law, we do not think it decisive here. Not only do both parties also do business in Virginia, but their relationship is centered on a Virginia project.

We conclude that Virginia has a stronger interest than does the District in setting standards and expectations for architects in connection with a renovation project in Virginia. The considerations enumerated in the Restatement likewise persuade us that Virginia has the more significant contacts with the claims of negligence and implied warranty. Accordingly, we agree with Judge Bowers that Virginia law applies to these claims.

B. *The Fraud and Negligent Misrepresentation Claims.*

The claims of fraudulent and negligent misrepresentation [20] are subject to a different analysis, for different interests are implicated. At issue is the right of citizens and businesses of the District of Columbia to be protected against fraud and misrepresentation allegedly carried out in the District. We conclude that the District has a stronger interest than does Virginia in the fraud and misrepresentation claims.

In *Blake, supra,* the court held that under Virginia law a contractor may not maintain an action against an architect or engineer for economic injury absent privity of contract between the parties. The decision was predicated on the perceived need to protect the economic expectations of the participants in the project. This consideration, which was so important to our conclusion that Virginia's interest in the negligence and implied warranty claims outweighs the District's, does not apply to the fraud and misrepresentation claims. Where a party's conduct has been induced by fraud or misrepresentation, the party engaged in the deceitful conduct has no legitimate expectation that it is entitled to profit from its misrepresentation. We think that the District has a compelling interest in protecting a District of Columbia entrepreneur from fraudulent and negligent misrepresentations, most of them allegedly made in the District, by another business entity based in the capital.

---

20. We address here only the claims in which Hercules alleges that Rippeteau fraudulently or negligently induced it to bid on the Alexandria project, and the other fraud claims which the trial court dismissed under Virginia law. The remaining fraud claims, which the trial court referred to arbitration, are addressed at n. 21, *infra.*

Section 148(b) of the Restatement provides a useful framework for selecting the law which applies to multi-state misrepresentation claims. It suggests the following six factors as helpful to the analysis:

(a) the place where the plaintiff relied on the defendant's misrepresentations;

(b) the place where the plaintiff received the misrepresentations;

(c) the place where the defendant made the misrepresentations;

(d) the domicile and place of incorporation and place of business of the parties;

(e) the place where the tangible thing which is the subject of the transaction between the parties was situated at the time; and

(f) the place where the plaintiff is to render performance under the contract which he has allegedly been induced to enter by fraud.

The essence of Hercules' claim of fraud is that it was induced into signing the Agreement by Rippeteau's fraudulent misrepresentations. Hercules asserts that it signed the Agreement with Shama, which was executed in the District, in reliance on what it was falsely told by Rippeteau. The initial assurances relating to the Church Street Project were allegedly made and received in the District. Hercules and Rippeteau are also both domiciled here. Accordingly, the considerations enumerated in items (a) through (d) in Section 148(d) of the Restatement weigh substantially in favor of applying District law.

The location of the "tangible thing that is the subject of the transaction," item (e), and the place of performance under the contract, item (f), point in the opposite direction. On balance, however, we think the District's interest in preventing fraudulent conduct in Washington, D.C. is paramount even if the project is located in Virginia. While Virginia has an obvious interest in regulating the relations between builders and architects within its borders, that concern does not extend to the setting of rules relating to fraudulent misrepresentations allegedly made outside Virginia by one District business to another.[21]

## IV

## CONCLUSION

In sum, we find that the order granting the stay pending arbitration between Hercules and Shama is not appealable, and dismiss Hercules' appeal from that order. We affirm the judge's ruling that Virginia law applies to the claims of negligence and implied warranty against Rippeteau, and his dismissal of those claims with prejudice. We also find that the trial court incorrectly applied Virginia law to certain fraud and misrepresentation claims against Rippeteau. Accordingly, the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

**21.** The trial judge referred three of the counts against Rippeteau (and the sole count against D.D.R.A.) to the arbitration proceedings between Hercules and Shama. In those counts Hercules alleged that Rippeteau engaged in a fraudulent scheme which included the making of false representations, the concealment of the actual building costs, and false attributions to Hercules of cost overruns.

A party to an arbitration agreement cannot be compelled to submit to arbitration matters which that party did not agree to arbitrate. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648–49, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986); *American Federation of Gov't Employees Local 3721 v.*

*District of Columbia*, 563 A.2d 361 (D.C.1989); *Poire v. Kaplan*, 491 A.2d 529, 533 n. 6 (D.C. 1985). Although there is an arbitration clause in the companion Agreement between Shama and Rippeteau, Rippeteau did not agree to arbitrate *anything* with Hercules, and these authorities apply *a fortiori.*

We are advised that Rippeteau refused to participate in the arbitration, and Hercules agrees that arbitration between these two parties cannot be compelled. The order to arbitrate with Rippeteau is not listed in Hercules' notice of appeal, and its appealability is questionable in light of this opinion. We suggest, however, that this portion of the order be vacated on remand by consent.