**ALLIED INVESTMENT CORPORATION, Allied Venture Partnership, Allied Technology Partnership, Allied Capital Advisors, Inc., and Allied Investment Corporation II, Plaintiffs,**

v.

**KPMG PEAT MARWICK, Thomas E. Dailey, George Lambert, Jon C. Madonna, Defendants.**

Civ. No. CV–92–0057–B.

United States District Court, D. Maine.

Jan. 23, 1995.

---

Ronald R. Massumi, Washington, DC, Harrison L. Richardson, Richardson & Troubh, Portland, ME, for plaintiffs.

Alan C. Geolot, Sidley & Austin, Washington, DC, Gerald F. Petruccelli, Petruccelli & Martin, Portland, ME, for defendants.

## ORDER AND MEMORANDUM
## OF DECISION

BRODY, District Judge.

In 1989, Consolidated Auto Recyclers ("CAR") was a potential target for an invest-

ment group comprised of Plaintiffs Allied Investment Corporation, Allied Venture Partnership, Allied Technology Partnership, Allied Capital Advisers, Inc., and Allied Investment Corporation II (collectively referred to as "Allied"). While considering whether to invest in CAR, Allied allegedly reviewed and relied on CAR financial reports prepared by Defendant KPMG Peat Marwick ("KPMG"), a firm CAR commissioned to audit its financial statements in an effort to attract investors. On October 30, 1989, the Allied–CAR transaction closed and Allied disbursed one million dollars to CAR (minus commitment and legal fees). (Def.'s Statement Material Facts at 9.) In doing so, Allied allegedly relied on KPMG's evaluations of, and reports about, CAR's financial stability. In addition, Allied purportedly relied on further communications from KPMG when making subsequent investments in, and loans to, CAR over the next few months. The investments eventually totalled over four million dollars. (*Id.* at 14.) In 1990, Allied's venture soured after CAR missed interest payments to Allied in January and February. (*Id.* at 13.) As CAR's financial condition worsened, Allied increased its level of investment, (*Id.* at 14), with the knowledge, by April of 1990, that CAR would have become insolvent absent Allied's aid. (*Id.* at 16.) On June 1, 1990, Allied declared CAR in default. (*Id.* at 17.) As it became increasingly apparent that CAR was an ill-advised investment, Allied considered whether it had been mislead by either CAR or KPMG. Eventually determining that such misrepresentations took place, Allied sued CAR, KPMG, and Raymond, Colesar, Glaspy & Huss, P.C.[1] in the summer of 1991. Allied's complaint was originally filed in the District Court for the District of Columbia. That court transferred the case to this District by Order dated February 7, 1992.

Allied's Complaint represented the mere tip of the iceberg with respect to this securities case. Six months prior to Allied's filing suit, CAR sued Allied alleging that Allied's acquisition of CAR and the circumstances surrounding that takeover were unlawful. In December of 1994, over five years after the events that led to this litigation commenced, CAR and Allied settled their competing claims. Subsequently, Allied and Raymond, Colesar indicated that they have settled their claims, leaving only Allied's allegations against KPMG remaining.[2]

While the current case is significantly less cumbersome in light of the separate settlements, it is by no means uncomplicated. In particular, Allied's Amended Complaint claims that KPMG committed various frauds and misrepresentations in violation of: § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5 promulgated pursuant to § 10(b), 17 C.F.R. § 240.10b–5; and the Revised Maine Securities Act, 32 M.R.S.A. §§ 10201 & 10605. This Court, by Order dated May 26, 1993, dismissed the Maine Securities Act claims. Allied also asserts that KPMG's acts and omissions constituted negligent misrepresentation regarding CAR's financial soundness. KPMG moves for summary judgment. That Motion is the subject of this Decision.

## I. Discussion

KPMG's Motion for Summary Judgment urges this Court to reject Allied's remaining claims for several reasons: first, Allied's federal allegations are time-barred; second, Allied did not rely on KPMG's alleged misrepresentations, nor were those representations material; third, KPMG had no duty to disclose any weaknesses in CAR's internal controls; fourth, a portion of Allied's negligent misrepresentation claim is precluded by choice of law principals; fifth, the senior note that is material to this litigation is not a security; and sixth, if the Court dismisses Allied's federal claims, it should also dismiss the state law claims for lack of jurisdiction.

---

1. Raymond, Colesar replaced KPMG as CAR's accounting firm subsequent to a disagreement between CAR and KPMG over the value of old inventory at CAR. Allied alleges that it also relied to its detriment, on Raymond, Colesar's representations when making investments in CAR.

2. While Raymond, Colesar and Allied have not officially notified the Court so as to seek approval of their settlement, the Court will treat their claims as settled. Accordingly this opinion will not address Raymond, Colesar's Motion for Summary Judgment or Allied's response.

For the reasons set forth in this opinion, KPMG's Motion for Summary Judgment is granted in part and denied in part.

## A. Summary Judgment

Summary judgment in all cases is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). " 'The moving party is entitled to judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e). Instead, the nonmoving party, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id.*

## B. The Statute of Limitations—Are Allied's Federal Claims Time–Barred?

Allied filed its initial Complaint in this action on July 11, 1991. KPMG contends that this filing violated the statute of limitations established by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321, *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). In *Lampf,* the Supreme Court created a uniform, federal statute of limitations for "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5[.]" Such litigation "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Id.* at 364, 111 S.Ct. at 2782. As Allied's complaint was clearly filed within three years of any alleged violation, this Court must determine only whether Allied filed its claim within one year after "discovery of the facts constituting the violation." *Id.*

## 1. Inquiry or Actual Notice?

■ The difficulty inherent in that determination is that the parties dispute whether "discovery of the facts" means discovery of the *actual* facts of the violation, or instead denotes discovery of general facts that should have put Allied on *inquiry notice* that KPMG was committing a violation. The initial question before the Court then, is whether, in the wake of *Lampf,* inquiry or actual notice is the governing standard for the purpose of determining the statute of limitations in § 10(b) and Rule 10b–5 cases.

KPMG argues that "[i]nquiry notice triggers the one-year *Lampf* statute of limitations." (Defs.' Mem.Supp.Mot.Summ.J. at 22 ("Defs.' Mem.").) If KPMG is correct, then Allied's claim is time-barred if it knew or should have known about the alleged violations more than one year prior to its filing suit. *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987). Allied argues, however, that "the *Lampf* standard is actual notice, not inquiry notice." (Pls.' Mem.Opp'n Defs.' Mot.Summ.J. at 6 ("Pls.' Mem.").) In support of this argument, Allied refers to the plain language in *Lampf,* referenced above: litigation "must be commenced within one year after the discovery of the facts constituting the violation...." *Lampf,* 501 U.S. at 364, 111 S.Ct. at 2782. Allied accordingly argues that its claim was timely because it was filed less than one year after Allied actually discovered KPMG's alleged securities violations.

## 2. The Meaning of *Lampf*

In enacting § 10(b) of the Securities Exchange Act of 1934, Congress did not provide an accompanying statute of limitations. "It is the usual rule" in such a situation that "a court 'borrows' or 'absorbs' the local time limitation most analogous to the case at hand." *Lampf,* 501 U.S. at 355, 111 S.Ct. at 2778. Prior to *Lampf,* this 'rule' was followed for many years in § 10(b) actions. On occasion, however, such a rule may be abandoned. The "determination [to abandon local borrowing] is a delicate one," *Id.,* but may be made when "a uniform statute of limitations is" appropriate, and when "an analogous federal source truly affords a 'closer fit' with the cause of action at issue than does any available state-law source." *Id.* at 357, 111 S.Ct. at 2779. In addition, the Court looks to

whether "the federal policies at stake and the practicalities of litigation make [a federal] rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* at 356, 111 S.Ct. at 2778 (quoting *Reed v. United Transportation Union*, 488 U.S. 319, 324, 109 S.Ct. 621, 625, 102 L.Ed.2d 665 (1989).

The Supreme Court found these factors to be present in litigation arising under § 10(b). *Id.* at 355–58, 111 S.Ct. at 2778–79. Accordingly, the issue to be resolved is what is the appropriate, federal, uniform standard. The *Lampf* Court decided that the most analogous statutes were: § 9(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(e); § 18(c) of the 1934 Act, 15 U.S.C. § 78r(c); and § 13 of the Securities Act of 1933, 15 U.S.C. § 77m. Each of these provisions "includes some variation of a 1–year period after discovery combined with a 3–year period of repose." *Lampf*, 501 U.S. at 360, 111 S.Ct. at 2780. Two of the statutes are almost identical. Section 9(e) of the 1934 Act states that no "action shall be maintained ... unless brought within one year after the discovery of the facts constituting the violation[.]" Similarly, § 18(c) of the 1934 Act states that no "action shall be maintained ... unless brought within one year after the discovery of the facts constituting the cause of action." However, the other provision chosen by the Supreme Court, § 13 of the 1933 Act, provides that no "action shall be maintained ... unless brought within one year after the discovery of the untrue statement or the omission *or after such discovery should have been made by the exercise of reasonable diligence* ..." (emphasis added).

Allied argues that the plain language of §§ 9(e) and 18(c) of the '34 Act require actual notice, while § 13 of the '33 Act calls for inquiry notice. The Supreme Court also noted that these provisions differ "in terminology." *Lampf*, 501 U.S. at 364, 111 S.Ct. at 2782 n. 9. Accordingly, the Court stated, in a footnote: "To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) of the 1934 Act[.]" *Id.* Section 9(e) does not expressly adopt an inquiry notice standard. In light of this, Allied contends that nothing

less than actual notice can trigger the statute of limitations for claims arising under § 10(b) and Rule 10b–5.

Allied's innovative argument has not yet been addressed by the First Circuit Court of Appeals. On its face, Allied's theory appears to have some merit. Several other circuit courts, however, have applied inquiry notice to § 10(b) and Rule 10b–5 actions, since *Lampf*, without addressing the Supreme Court's footnote. *E.g., Howard v. Haddad*, 962 F.2d 328, 330 (4th Cir.1992); and *Menowitz v. Brown*, 991 F.2d 36, 41 (2d Cir. 1993) ("We see no reason to depart from" the practice of requiring inquiry notice.). More importantly, at least two other circuits utilize inquiry notice as the governing standard in § 10(b) actions, while acknowledging that the *Lampf* decision did not expressly adopt inquiry notice. The Seventh Circuit stated that the "governing" provision selected by the Supreme Court in *Lampf*, "[s]ection 9(e), read literally, requires actual notice to set the statute of limitations running." *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 721 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). The *Tregenza* court nevertheless concluded that courts are still "free to apply to [§ 9(e) ] the judge-made doctrine of inquiry notice.... Nothing in the language, history, or purpose of section 9(e) forecloses so modest and traditional an exercise of judicial creativity." *Id.* at 722.

Similarly, the Tenth Circuit, while recognizing the conflict created by the fateful *Lampf* footnote, specifically rejected an argument identical to the one made by Allied in this case:

When the Court selected § 9(e), it did not necessarily indicate a preference for the type of notice of the violation but sought a "governing" standard to link the implied § 10(b) remedy to those express securities causes of action which uniformly require one year after notice of the violation.... Thus, under *Lampf*, ... plaintiffs [are] required to show their complaint was timely filed within one year of their notice of the violation, *when they knew or should have known* [of the violation]....

*Anixter v. Home–Stake Prod. Co.*, 947 F.2d 897, 899 (10th Cir.1991) (second emphasis added). This Court agrees. While a superficial reading of *Lampf* may suggest otherwise, the Supreme Court could not have intended to uniformly eliminate inquiry notice in this context by way of dictum in a footnote! Such a conclusion would excessively "protect investors against market risk." *Tregenza*, 12 F.3d at 722. Under Allied's reading of *Lampf*, a plaintiff who was fraudulently induced to make a bad investment could wait "patiently to sue. If the stock rebounded from the cellar they would have investment profits, and if it stayed in the cellar they would have legal damages. Heads I win, tails you lose. This tactic is discouraged by the doctrine of inquiry notice[.]" *Id.* Accordingly, the Court concludes that inquiry notice is the proper standard to be applied in the wake of the *Lampf* decision and its progeny.

The next question before the court is whether Allied had inquiry notice of this action more than one year prior to its filing suit. In other words, the Court must decide if:

> (1) sufficient facts were available to put a reasonable investor in plaintiff's position on inquiry notice of the *possibility* of fraud, and (2) plaintiff exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct.

*Maggio*, 824 F.2d at 128 (citation omitted). In the First Circuit, " 'storm warnings' of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner[.]" *Id.* (quoting *Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978)).

■ The Court is satisfied that, in this case, sufficient "storm warnings" existed to put Allied on inquiry notice of possible securities violations by KPMG more than one year before it filed suit. For example, CAR missed interest payments due to Allied in January and February of 1990, and Allied declared CAR in default on June 1, 1990,

more than one year prior to filing suit. In *City Nat'l Bank v. Checkers, Simon, & Rosner*, 32 F.3d 277 (7th Cir.1994), the plaintiff relied on financial statements prepared by an accounting firm when deciding to loan money to a client of that firm. When the client defaulted on the loan, the court held that the plaintiff should have been "on notice of a need to investigate ... and whether, and against whom, the [plaintiff] may have had causes of action," including the accounting firm. *Id.* at 284. Similarly, here, Allied alleges that it relied on KPMG's reports and communications regarding CAR. Accordingly, upon CAR's default, Allied should have looked into CAR *and* KPMG's role, if any, in misleading Allied into making investments in, and loans to, CAR.

Moreover, not only was Allied aware of CAR's difficulties in maintaining itself as a going concern, but KPMG had issued disclaimers with respect to its audit reports. Allied did not have to fully discover "the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Kennedy v. Josephtal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987) (citations omitted).

Allied filed its Complaint on July 11, 1991. The Court is convinced that there were many indications and red flags before July 1990 that should have led Allied to investigate whether KPMG was perpetrating a fraud. Indeed, the Court has highlighted but a few. As a result, Allied's federal securities claim against KPMG is time-barred.[3]

## C. Supplemental Jurisdiction

KPMG asserts two jurisdictional arguments pursuant to 28 U.S.C. § 1367. First KPMG argues that if Allied's federal claims are dismissed, this Court should make the discretionary decision not to exercise jurisdiction over the remaining state claim of negligent misrepresentation. Second, KPMG argues in a footnote that because

---

3. KPMG also sought Summary Judgment on the portion of Allied's 10b–5 claim that was grounded on a $500,000 senior note asserting that the note was not a security. Having precluded all litigation of Allied's federal claims due to the statute of limitations, the Court need not address this argument.

there is no diversity jurisdiction over the parties, the Court should decline to continue to exercise jurisdiction over this case.[4] The Court will address this latter claim first.

■ 28 U.S.C. § 1367(b) provides that

In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district court shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction would be inconsistent with the jurisdictional requirements of section 1332.

None of these rules, however, reflect the posture of this case, in which Allied directly sued KPMG.[5] The posture of the case is critical because "subdivision (b) carves out specific instances in which it excludes the supplemental jurisdiction in diversity cases. [But by] no means does it exclude it from diversity cases in general." Practice Commentary to 28 U.S.C. § 1367, David D. Siegel, *The 1990 Adoption of § 1367, Codifying "Supplemental" Jurisdiction*, in 28 U.S.C.A. § 1367 at 832 (West 1993).

Simply because a case comes to lack "diversity jurisdiction and ... federal question jurisdiction, does not decide the pressing issue of the proper exercise of pendent jurisdiction of the state-law claims advanced along with" the now dismissed federal claims. *Newport Ltd. v. Sears, Roebuck & Co.*, 941 F.2d 302, 307 (5th Cir.1991). Indeed, in these cases, "[t]he decision to exercise or decline pendent jurisdiction is within the discretion of the district court." *Id.* (citations

omitted). *See also* 28 U.S.C. § 1367(c) which states that "the district courts *may* decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction[.]" (emphasis added). KPMG argues that this Court should exercise that discretion to dismiss Allied's remaining state-law claim.

■ This case, however, is not one where "all the federal claims have been dismissed at an early stage in the litigation...." *Loan v. F.D.I.C.*, 717 F.Supp. 964, 969 (D.Mass.1989) (dismissing the remaining state claims). Rather, this litigation has been ongoing in federal court for years, and dismissal of the federal claim has occurred "late in the action, after there has indeed been substantial expenditure in time, effort, and money in preparing the dependent claims[.]" Practice Commentary to 28 U.S.C. § 1367, David D. Siegel, *The 1990 Adoption of § 1367, Codifying "Supplemental" Jurisdiction*, in 28 U.S.C.A. § 1367 at 835 (West 1993). Consequently, "knocking [Allied] down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary." *Id.* Factors such as judicial economy, convenience, and fairness to the litigants, all counsel this Court to retain supplemental jurisdiction over Allied's state claim of negligent misrepresentation. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) (factors to be considered are "judicial economy, convenience, fairness, and comity").

In *Newport Ltd.*, the Fifth Circuit relied on these factors to reverse a district court dismissal of state claims where both federal question *and* diversity jurisdiction had been eliminated. As in that case, there have been "hundreds of Court hours devoted to the case and ... the litigation [has] reached the 'eve

---

4. In fact, KPMG twice makes a supplemental jurisdiction argument—in its Motion for Summary Judgment and in an earlier Motion to Dismiss, that the Court will consider and resolve in conjunction with this Motion. The Court notes that Allied failed to respond at all to the initial Motion to Dismiss by KPMG. While such an omission could be fatal under some circumstances, the Court will not jeopardize four years of litigation over such a technical failure. Ac-

cordingly, the Court will treat Allied's arguments in opposition to KPMG's Motion for Summary Judgment as also opposing the earlier Motion to Dismiss.

5. Rule 14 governs third party practice, Rule 19 governs mandatory joinder, Rule 20 governs permissive joinder, and Rule 24 governs intervention.

of trial after years of difficult discovery.' " 941 F.2d at 308 (quoting the lower court decision). This case has come too far for this Court to force the parties, and a state court, to start anew.

## D. Remaining State Law Issue—Negligent Misrepresentation

Having retained jurisdiction over Allied's non-federal claim, this Court must now determine whether KPMG's Motion for Summary Judgment disposes of that claim. Allied alleges that it relied on written and oral statements by KPMG that did not accurately reflect CAR's financial condition. Allied also asserts that KPMG was aware of the use to which the financial information was to be put by Allied. Before reaching the merits of these assertions, the Court must first address two arguments made by KPMG asserting that distinct, severable portions of Allied's negligent misrepresentation claim are barred from trial, as a matter of law.

### 1. Choice of Law

■ KPMG first asserts that choice of law principles dictate that it cannot be sued for negligent misrepresentation with respect to a December 31, 1988, audit conducted by KPMG. As this case was transferred pursuant to 28 U.S.C. § 1404(a), this Court must apply the choice of law rules of the transferor forum—the District of Columbia. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 243 n. 8, 102 S.Ct. 252, 259 n. 8, 70 L.Ed.2d 419 (1981) District of Columbia law requires the Court to "identify the state policies underlying each law in conflict and . . . to decide which state's policy would be advanced by having its law apply." *In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333, 342 (D.D.C. 1983) (citation omitted). In addition, District of Columbia courts, as Allied suggests, have "applied a constructive blending" of the above approach with the Restatement's approach which identifies "the jurisdiction with the 'most significant relationship' to the dispute." *Hercules & Co. v. Shama Restaurant Corp.,* 566 A.2d 31, 40–41 (D.C.1989). Obvi-

ously, " 'the state with the most significant relationship should also be the state whose policy is advanced by application of [its] law.' " *Id.* at 41 (quoting *In re Air Crash Disaster,* 559 F.Supp. at 342). Under this "analysis as so refined, we must 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case[.]' " *Id.* at 41 (quoting *Kaiser–Georgetown Community v. Stutsman,* 491 A.2d 502, 509 (D.C. 1985)).

■ In this case, Maine is the "jurisdiction with the 'most significant relationship' to the dispute." *Hercules & Co.,* 566 A.2d at 40–41. While Allied and KPMG have D.C. offices, KPMG's relevant "office was in Maine; the company being audited was in Maine; the audit was conducted in Maine; the professionals who did the audit resided in Maine; [and] the draft audit reports and financial statements were prepared in Maine[.]" (Pls.' Mem. at 40.) With respect to a negligent misrepresentation claim, District of Columbia courts find that the District's interests are implicated where the "right of citizens and businesses of the District . . ." is infringed upon by "fraud and misrepresentation allegedly carried out in the District." *Id.* at 42. Accordingly, the District of Columbia "has a compelling interest in protecting [the city's] entrepreneur[s] from fraudulent and negligent misrepresentations, . . . allegedly made in the District, by another business entity based in the capital." *Id.*

The District of Columbia's interest in protecting its entrepreneurs is minimally impacted by the alleged misrepresentation in the December 31, 1988, audit. Maine's interest, however, is implicated to a far greater degree.[6] It follows that Maine is the " 'jurisdiction [whose] policy would be most advanced by having its law applied to the facts of the case[.]' " *Id.* at 41 (quoting *Kaiser– Georgetown Community,* 491 A.2d at 509). The Court rejects KPMG's choice-of-law argument.

---

6. Obviously, the State of Maine shares the same interest as does the District of Columbia with respect to citizens, businesses, and entrepreneurs

living and/or conducting business within Maine's borders.

## 2. KPMG's Duty to Disclose Weaknesses in CAR's Internal Controls

█ KPMG next argues that it had no duty to disclose weaknesses in internal controls in CAR, and therefore, any allegation that KMPG breached such a duty may not be considered at trial. KPMG's argument on this issue is not without some merit. The question is, however, whether that argument should prevail on Summary Judgment.

The facts indicate that KPMG discovered, evaluated, and reported to CAR weaknesses in its internal controls. Accordingly, KPMG met the dictates of the Generally Accepted Auditing Standards (GAAS). *See, e.g., Monroe v. Hughes,* 31 F.3d 772, 775 (9th Cir.1994) ("Such deficiencies are reported to management[.]"). There is, however, no duty under those standards to report deficiencies in internal controls in the audit report itself. *Id.*

Allied asserts, however, that KPMG's conduct was not governed by GAAS alone, but that there was a separate duty to disclose which required KPMG to report the internal controls problems to Allied. Such a duty does not arise independently under federal securities law. *Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988) A duty to disclose can, of course, arise by virtue of a special relationship between the parties, or because of particular state law requirements. KPMG argues that there was no special relationship between the parties, and that the Maine accountant-client confidentiality privilege bars such disclosure. Allied responds that the initial Investment Agreement between CAR and Allied obligated KPMG to report weaknesses in CAR's internal controls to Allied despite the accountant-client privilege.

In Maine, an accountant "shall not voluntarily disclose information communicated to him by the client relating to, and in connection with, services rendered to the client by the licensee in the practice of public accountancy." 32 M.R.S.A. § 12279 (1987). This rule may be obviated, however, "by permission of the client engaging a licensee under this chapter." *Id.* Allied cites ¶ 6.18 of the initial Investment Agreement between Allied and CAR as evidence of such permission. This agreement was entered into on October 30, 1989, as a result of Allied's initial investment in CAR. Paragraph 6.18 provides in its entirety:

> 6.18 *Access to Records.* Permit any authorized representative of any Holder and their attorneys and accountants to inspect, examine and make copies and abstracts of the books of account and records of the Company at reasonable times during normal business hours; allow Holders or their agents to interview the Company's outside accountants who are by this covenant irrevocably instructed to respond to such inquiries as fully as if made by the Company itself[.]

(Pls.' App.Tab 26 at 2.) The Court agrees with KPMG that this provision did not obligate Defendants to *voluntarily* disclose internal weaknesses in CAR to Allied. The provision may, however, have created a duty to respond to Allied's inquiries in such a way that the internal controls problem should have been disclosed.

The Court focuses in particular on the fact that Allied inquired orally to KPMG's Audit Partner, Thomas Dailey, about the advisability of investing in CAR. Specifically, an Allied official asked Dailey if he would invest in CAR or if he had "areas of concern . . . that would make it difficult for him to complete his audit work." Dailey responded that he would invest in CAR and that he saw "no areas of concern." (Russell Dep. at 142.) What makes this alleged conversation critical is that Dailey wrote an internal memorandum indicating that KPMG would have trouble auditing CAR without risk of error and that CAR was *not* a good investment target. Dailey's memorandum stated that KPMG's audit engagement

> involves . . . high internal control risk . . . [and] the risk that our audit procedures will fail to detect material errors is increased . . . I see no factors about this business that lead me to believe it will succeed. I believe it is likely it will fail. If it does fail, I believe it is likely that we would find ourselves involved in a lawsuit.

(Pls.' App.Tab 19 at 1–2.) Allied's inquiries to Mr. Dailey, and his statements in this internal memorandum, present sufficient is-

sues of fact that require the Court to deny KPMG's Motion for Summary Judgment on the issue of whether KPMG had a duty to disclose weaknesses in CAR's internal controls.

### 3. The Merits of Allied's Negligent Misrepresentation Claim

 Having resolved KPMG's choice of law and duty arguments, the Court now considers the substance of KPMG's argument that, as a matter of law, Summary Judgment should be granted on Allied's negligent misrepresentation claim as a whole. Regardless of whether a duty to disclose did or did not exist, KPMG asserts that Allied could not have relied on KPMG's statements and omissions, and those statements and omissions were not sufficiently material to give rise to a negligent misrepresentation claim. Maine has adopted § 552 of the Restatement (Second) of Torts as the appropriate standard for negligent misrepresentation claims. *Jordan–Milton Mach., Inc. v. F/V Teresa Marie, II*, 978 F.2d 32, 36 (1st Cir.1992) (citing *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990); *Diversified Foods, Inc. v. First Nat'l. Bank*, 605 A.2d 609, 615 (Me.1992)). The elements of such a claim are delineated by § 552(1) which states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). KPMG argues that Allied cannot demonstrate, as a matter of law, either that it relied on misstatements or omissions made by KPMG, or that those misstatements or omissions were material. Allied responds that it relied to its detriment both on KPMG's audit reports and its oral communications about the appeal of the CAR investment. Having reviewed the record, the various motions, and the voluminous appendices which have been submitted, the Court is reluctant to grant Summary Judgment at this stage of the proceedings. Material issues of fact exist, including, but not limited to, the circumstances surrounding the Dailey memorandum. These issues of fact preclude entry of summary judgment on Allied's negligent misrepresentation claim.

### II. Conclusion

For the reasons stated in this opinion, the Court *GRANTS* KPMG's Motion for Summary Judgment with respect to the statute of limitations issue. Allied was on inquiry notice; its federal claims are time-barred. The rest of KPMG's Motion for Summary Judgment is *DENIED*.

*SO ORDERED.*