Manchester Mfg Acquisitions v. Sears   CV-91-752-SD   09/26/95 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Manchester Manufacturing
 Acquisitions, Inc., et al

    v.                                          Civil No. 91-752-SD

Sears, Roebuck & Co., et al


                           O R D E R


     In this diversity action, plaintiffs Manchester

Manufacturing Acquisitions, Inc., Gary A. Dinco, and Felix J.

Weingart, Jr., allege that defendants[1] violated federal and state

securities laws and made negligent misrepresentations in

connection with the 1988 sale of the distribution warehouse

business known as Manchester Manufacturing, Inc. (MMI).[2]

     Presently before the court is defendants' motion for summary

judgment and plaintiffs' cross-motion for summary judgment, along

_____

     [1]As of the date of this order, there is presently pending
before the court a settlement agreement executed between the
plaintiffs and Sears.  By the terms of said agreement, all claims
against Sears are intended to be dismissed with prejudice.
Accordingly, the term "defendants" as employed herein includes
all of the captioned defendants except Sears.

     [2]For a more complete discussion of the underlying facts in
this action, see generally Manchester Mfg. Acquisitions, Inc. v.
Sears, Roebuck & Co., 802 F. Supp. 595, 597-98 (D.N.H. 1992).

with respective objections thereto.  In addition, defendants have filed, over objection, motions to strike the affidavits of Randall Cooper and John Georges, as well as a motion to strike plaintiffs' cross-motion for summary judgment.

## Discussion

Defendants have moved for summary judgment based on a variety of theories.  The court will thus proceed through the remaining counts[3] in seriatim.

## 1.  Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R.

---

[3]At the outset of this litigation, defendants moved to dismiss.  By written order dated September 30, 1992, the court dismissed, with prejudice, the claim brought under the Securities Act of 1933, 15 U.S.C. § 77q(a).  See Manchester Mfg., supra note 2, 802 F. Supp. at 598-99.  Counts II-IV--alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); New Hampshire's Blue Sky Law, New Hampshire Revised Statutes Annotated (RSA) 421-B; and common-law fraudulent misrepresentation, respectively--were dismissed without prejudice for failure to plead with sufficient particularity.  See id. at 601-03.  Count V--common-law negligent misrepresentation-- survived the Rule 12(b)(6), Fed. R. Civ. P., motion and is herein attacked on summary judgment.

Civ. P. "In general . . . a party seeking summary judgment [is required to] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)), cert. denied, ___ U.S. ___, 115 S. Ct. 2247 (1995).

"[T]rialworthiness[, however,] necessitates 'more than simply show[ing] that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushida Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (second alteration in National Amusements). Thus, "'[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . .'" Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).

The record on summary judgment is reviewed "in the light most favorable to the nonmoving party, and [the court shall] indulge all reasonable inferences in that party's favor." Colonial Courts Apartment Co. v. Proc Assocs., Inc., 57 F.3d 119,

122 (1st Cir. 1995) (citing <u>Inn Foods, Inc. v. Equitable Coop.</u> <u>Bank</u>, 45 F.3d 594, 596 (1st Cir. 1995)).

## 2. <u>Defendants' Motion for Summary Judgment (document 69)</u>
### a. <u>Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)</u>

Defendants contend that any entitlement plaintiffs may have for relief under 15 U.S.C. § 78j(b) is foreclosed by the running of the limitations period.[4]

As dictated by the Supreme court, "[l]itigation instituted pursuant to [15 U.S.C. § 78j(b)] and [Securities and Exchange Commission] Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." <u>Lampf, Pleva, Lipkind,</u> <u>Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 364 (1991)

---

[4]The court notes that this argument was previously raised in defendants' motion to dismiss, discussed <u>supra</u> note 3. However, in ruling on said issue, the court indicated "on the record before it, while the court is unwilling to say that plaintiff can prove no set of facts in support of this claim which would entitle them to relief, it is also unable to resolve the limitations period issue." <u>Manchester Mfg.</u>, <u>supra</u> note 2, 802 F. Supp. at 600. Nearly three years of discovery have elapsed since that time, and the record is now sufficiently developed for the court to make a ruling thereon.

(footnote omitted).  For the purposes of ruling on the motion sub judice, the court is satisfied that plaintiffs brought their claim within the three-year period of repose.  Accordingly, the balance of the court's analysis will be directed to determining "whether plaintiffs filed their complaint within one year of discovery of the facts constituting the violation, as Lampf requires."  Manchester Mfg., supra note 2, 802 F. Supp. at 599.

### (1) Inquiry or Actual Notice?

Whether plaintiffs will be permitted to maintain their claim under the Securities Exchange Act depends upon what type of notice the Supreme Court intended when it limited such litigation to being commenced "within one year after the discovery of the facts constituting the violation . . . ."  Lampf, supra, 501 U.S. at 364.  Plaintiffs argue that actual notice is the standard, whereas defendants contend that inquiry notice is all that is required to initiate the limitations clock.

Although the First Circuit has not directly addressed this question since the Supreme Court issued its ruling in Lampf, panel decisions from the other circuits have uniformly interpreted Lampf as requiring inquiry notice rather than actual notice.  See, e.g., Tregenza v. Great Am. Communications Co., 12

F.3d 717, 722 (7th Cir. 1993) (doctrine of inquiry notice applicable in Rule 10b-5 suits), cert. denied, ___ U.S. ___, 114 S. Ct. 1837 (1994); Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993) ("'discovery' under the 1934 Act limitation provisions includes constructive or inquiry notice, as well as actual notice" (citation omitted)); Howard v. Haddad, 962 F.2d 328, 330 (4th Cir. 1992) (one-year discovery limitations period begins to run either upon notice of fraud or when, in exercise of reasonable diligence, plaintiff would have discovered them") (emphasis added) (citing Davis v. A.G. Edwards & Sons, Inc., 823 F.2d 105, 107 (5th Cir. 1987)). Accord Allied Inv. Corp. v. KPMG Peat Marwick, 872 F. Supp. 1076, 1081 (D. Me. 1995) ("inquiry notice is the proper standard to be applied in the wake of the Lampf decision and its progeny").

The court herewith finds and rules that the level of notice mandated by the Supreme Court in Lampf is inquiry, or constructive, notice.


### (2) What Constitutes "Inquiry" Notice?

The logical consequence of finding that inquiry notice commences the one-year limitations period is whether plaintiffs can appropriately be charged with same. In this regard, the

6

court must decide if:

> (1) sufficient facts were available to put a reasonable investor in plaintiff[s'] position on inquiry notice of the *possibility* of fraud, and (2) plaintiff[s] exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct.

Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987) (citation omitted). Moreover, and in contrast to their assertion otherwise, plaintiffs "did not have to fully discover 'the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.'" Allied Inv. Corp., supra, 872 F. Supp. at 1081 (quoting Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987) (citations omitted in Allied); accord Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1263 (4th Cir. 1993) (same).

"In the First Circuit, '"storm warnings" of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner[.]'" Allied Inv. Corp., supra, 872 F. Supp. at 1081 (quoting Maggio, supra, 824 F.2d at 128 (quoting Cook v. Avien, Inc., 573 F.2d 685, 697 (1st Cir. 1978))) (alteration in Allied). See also Cooke, supra, 998 F.2d at 1263

7

("A securities plaintiff must exercise due diligence in the investigation of misconduct. The exercise of due diligence is measured by an objective standard, and whether due diligence was exercised must be judged 'solely under the peculiar circumstances of each case.'" (quoting deHaas v. Empire Petroleum Co., 435 F.2d 1223, 1226 (10th Cir. 1970)) (other citations omitted).

Plaintiffs acquired ownership control of MMI on December 29, 1988. The evidence before the court reveals the following course of significant events in the nearly three years subsequent to said sale and the filing of the instant lawsuit on December 26, 1991:

> 40. Within weeks of the sale of MMI to plaintiffs, Sears' distribution business with Acquisitions began to decrease. Within one year, Sears' distribution business with plaintiff Acquisitions was down by seventy percent (70%).
> 41. On December 24, 1989, plaintiffs were notified by Sears that it would not renew its distribution contract with Acquisitions for the year commencing January 1, 1990.
> . . . .
> 43. Repeated attempts to re-negotiate with sears were to no avail, as were plaintiffs['] many attempts to secure replacement business, to cut costs, by, for example, reducing their work force from 60 employees to 3 employees, or to sell the assets of the business.
> 43A. The plaintiffs contacted Sears regarding the termination and lack of business. By letter dated August 16, 1990, Edward A. Brennan, Chairman of the Board of Sears, informed the plaintiffs that the

8

> termination of the distribution business with
> MMI was a result of a study of the
> distribution system that had been under
> review for several years. This study was
> subsequently determined to be the RDOF
> [Replenishment and Distribution of the
> Future].

Second Amended Complaint at 14.

In the opinion of the court, the December 24, 1989, notice from Sears that it would not be renewing the distribution contract constitutes a sufficient "storm warning" that the financial and business picture defendants have allegedly presented prior to the sale was not, in fact, as it would seem. Further, the court finds and rules that the August 16, 1990, letter from Sears Chairman Edward Brennan specifically informing plaintiffs that the termination of business was as a result of multi-year feasibility study is further evidence of troubled and precarious "weather". Despite these prominent and foreboding winds, plaintiffs chose to wait an additional sixteen months before filing the suit under section 10(b). Such delay was unreasonable. Consequently, defendants' motion for summary judgment as to the alleged violation of 15 U.S.C. § 78j(b) (Count II) must be and herewith is granted.

9

b.  Applicability of New Hampshire Blue Sky Law (RSA) 421-B:3

Although conceding that stock did change hands, defendants contend that this circumstance "was a mere formality to which the securities laws should not apply."  Defendants' Memorandum of Law at 30.  Defendants further submit that, "[i]n economic reality, [the transaction herein at issue] was the sale of the assets in a closely held corporation to its own management [and therefore] not the type of investment transaction to which the New Hampshire Blue Sky Law was intended to apply."  Id.

This argument is fatally hampered by the court's reading of Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985), and is not resuscitated by virtue of the holding in Anderson v. Heck, 554 So. 2d 695 (La. Ct. App. 1989), writ denied, 558 So. 2d 605 (La.), cert. denied, 498 U.S. 846 (1990).  For the reasons that follow, defendants' motion for summary judgment as to the claim brought under RSA 421-B:3 (Count III) is herewith denied.

(1)  Definition of "Security"

Under the state securities statute,

> "Security" means any note; stock, treasury
> stock; bond, debenture; evidence of
> indebtedness; certificate of interest or
> participation in any profit sharing

10

agreement; collateral trust certificate; preorganization certificate or subscription; transferable shares; investment contract; investment metal contract or investment gem contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining right, title or lease or in payments out of production under such a right, title or lease; or, in general, any interest or instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or for some other specified period.

RSA 421-B:2, XX (1991).[5]  Facially, therefore, the transaction at issue falls within the statutory definition.


### (2)   The Effect of Landreth

In <u>United Housing Found., Inc. v. Forman</u>, 421 U.S. 837 (1975), the Supreme Court held that shares of "stock" are traditionally evidenced by the following features: (1) the right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) subjection to pledge or hypothecation; (4)

---

[5]The court notes that this definition of security is substantially similar to that incorporated into the federal securities laws.  <u>See</u> 15 U.S.C. § 780(a)(10) (1981 & Supp. 1995).

11

voting rights proportional to number of shares owned; and (5) possibility of appreciation in value. Id. at 851; see also II LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 987, 989-95 (3d ed. 1989) (discussing Forman and Landreth in context of stock transfer as a sale of business means). Because the shares of stock at issue in Forman merely entitled the purchaser to lease an apartment in a housing cooperative, and bore none of the aforementioned characteristics, the court ruled that such instruments did not qualify as "securities". Forman, supra, 421 U.S. at 851.

Landreth, however, presented an entirely different transaction; one that is more closely analogous to the situation presented herein. Pursuant to a negotiated stock purchase agreement, an investor acquired all of the common stock of a lumber company and assigned same to a corporation formed for the sole purpose of acquiring the stock, which then merged with the original lumber company to form the Landreth Timber Company. Landreth, supra, 471 U.S. at 683-84. Eventually, the stock was divided into two classes, A and B, and ultimately split among eight investors--two individuals owning all of the Class A stock and six individuals acquiring all of the Class B stock. The two classes represented 85% and 15% of equity, respectively. Id. at

12

684. Business eventually soured, the mill was sold at a loss and placed into receivership, and a suit based on violations of the federal securities laws and intentional/negligent misrepresentation soon followed. Id.

Although the district court "ruled that the stock could not be considered a 'security' unless the purchaser had entered into the transaction with the anticipation of earning profits derived from the efforts of others," id. at 684-85, and the Ninth Circuit affirmed on the grounds that the federal securities laws do not apply to the sale of 100% of the stock of a closely held corporation,[6] id., the Supreme Court reversed. Id. at 697.

Whereas the definition of "security" in the federal statutes "is quite broad" and "most instruments bearing such a traditional title are likely to be covered by the definition," id. at 686, "the fact that instruments bear the label 'stock' is not itself sufficient to invoke the coverage of the [Securities Acts of 1933 & 1934]," id. Further analysis must be undertaken to determine "whether those instruments possess 'some of the significant characteristics typically associated with' stock . . . ." Id. (quoting Forman, supra, 421 U.S. at 851).

Not only did the stock at issue in Landreth satisfy the

_____

[6]This is known as the "sale of business" doctrine.

criteria identified in <u>Forman</u>, "the context of the transaction involved here -- the sale of stock in a corporation -- is typical of the kind of context to which the Acts normally apply." <u>Id.</u> at 687. Accordingly, "the plain meaning of the statutory definition mandates that the stock be treated as 'securities' subject to the coverage of the Acts." <u>Id.</u> This case seems to fall foursquare within the parameters of <u>Landreth</u>.[7]

<u>Anderson v. Heck</u>, 554 So.2d 695 (La. Ct. Ap. 1989), cited with approval in defendants' memorandum of law, while facially relevant in that it involved a 100 percent sale of a business as a going concern, specifically refuses to conform to the <u>Landreth</u> holding. <u>See</u> <u>id.</u> at 700 ("Although the definition of 'security' in the Federal statute is almost identical to the definition adopted by Louisiana, we decline to follow the literalist approach taken by the court."). As between the United States Supreme Court and a state intermediate appellate court, this district court is not only bound to follow the former, but finds

---

[7]This court's prior ruling in <u>Manchester Bank v. Connecticut Bank & Trust Co.</u>, 497 F. Supp. 1304, 1305 (D.N.H. 1980) is inapposite not only because it predates <u>Landreth</u> but moreover because the alleged security at issue was a participation agreement rather than literal stock shares.

14

same to be the more persuasive.[8]

Among the numerous documents associated with plaintiff's purchase of MMI is an instrument entitled "Stock Purchase Agreement." Exhibit A to Defendants' Motion for Summary Judgment. For the sum of $345,000, "each [defendant] shall sell, transfer, assign and deliver to the [plaintiff] and the [plaintiff] shall purchase from each [defendant] . . . shares of capital stock of the Company . . . ." Stock Purchase Agreement ¶ 1.1.[9] The court finds this designation sufficient to meet the first prong of the Landreth "security" test. See Landreth, supra, 471 U.S. at 686.

Reference to the October 31, 1974, "Stockholders Agreement,"

---

[8]Defendants' attempt to distinguish Anderson from Landreth on the basis of the amount of control transferred in the transaction is similarly unpersuasive. In a companion case to Landreth, Gould v. Ruefenacht, 471 U.S. 701 (1985), the Court restated Landreth's primary holding--"where an instrument bears the label 'stock' and possesses all of the characteristics typically associated with stock, a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a 'security' within the meaning of the Acts." Id. at 704 (emphasis added) (citation omitted). It then went on to note that distinctions as to the amount of control transferred or when less then 100 percent of a company's stock is sold "make little sense in view of the Acts' purpose to protect investors." Id. at 706.

[9]The instrument further indicates that defendant Dylex B.V. sold 420 shares of Capital Stock for the sum of $144,900 and defendant Dylex Limited sold 300 shares for $103,500. The remaining 280 shares were owned by Sears, who sold same for $96,600. Stock Purchase Agreement ¶¶ 1.1, 1.2.

15

executed by the defendants and MMI, further satisfies the court that the "stock" purchased by plaintiffs possesses those "traditional features" delineated by the <u>Landreth</u> court. <u>See</u> <u>id.</u>; <u>see also</u> Stockholders Agreement (attached to Plaintiff's Statement of Facts as Exhibit 3).

Since "'a purchaser justifiably [may] assume that the federal securities laws apply," <u>Landreth</u>, <u>supra</u>, 471 U.S. at 686 (quoting <u>Forman</u>, <u>supra</u>, 421 U.S. at 850), "when an instrument is both called 'stock' and bears stock's usual characteristics," <u>id.</u>, the court finds and rules that the stock herein at issue constitutes a "security" as defined in the federal securities laws. <u>Accord</u> <u>id.</u> at 687-88; <u>Gould</u>, <u>supra</u>, 471 U.S. at 704.

The court further finds and rules that since the definition of "security" is substantially similar under both federal and state law, and no principled reason exists for drawing a distinction between the two given their collective protective purpose, said stock falls within the definition of "security" as that term is intended in RSA 421-B:3. <u>Accord</u> RSA 421-B:32 ("This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of this chapter with the related federal regulation.").

In consequence thereof, defendants' motion for summary

16

judgment as to the asserted violation of the New Hampshire Blue Sky Law, RSA 421-B:3, must be and herewith is denied.

####     c.   Standards Applicable to Fraudulent and Negligent Misrepresentation Claims (Counts IV and V)

Defendants assert an entitlement to summary judgment on the common law misrepresentation claims because "Plaintiffs continue to fail to allege and demonstrate each Defendant's role and how each Defendant furthered the alleged fraudulent scheme." Defendants' Memorandum of Law at 32. Plaintiffs' argument in opposition essentially maintains that the course of discovery has produced "a record replete with evidence from which a reasonable jury could find that all defendants, either directly or through their authorized representatives, misrepresented, or omitted to disclose, material information . . . ." Plaintiffs' Memorandum of Law at 38-39, making summary judgment inappropriate and unwarranted.

"With respect to the plaintiffs' count[s] based on negligent or fraudulent misrepresentation, '[o]ne who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.'" Gray

17

v. First NH Banks, 138 N.H. 279, 283, 640 A.2d 276, 279 (1994)
(quoting RESTATEMENT (SECOND) OF TORTS § 525 (1976)); see also
Hydraform Prods. Corp. v. American Steel & Aluminum Corp., 127
N.H. 187, 200, 498 A.2d 339, 347 (1985) (basic elements of tort
of negligent misrepresentation is "the defendant's negligent
misrepresentation of a material fact and the plaintiff's
justifiable reliance on that misrepresentation").

Additionally, "optimistic predictions about the future that
prove to be off the mark likewise are immunized unless plaintiffs
meet their burden of demonstrating intentional deception."
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st
Cir. 1994) (citations omitted).  In this regard,

> general averments of the defendants'
> knowledge of material falsity will not
> suffice.  Greenstone [v. Cambex Corp.,
> supra], 975 F.2d [22,] 25 [(1st  Cir. 1992)].
> Consistent with Fed. R. Civ. P. 9(b), the
> complaint must set forth "specific facts that
> make it reasonable to believe that
> defendant[s] knew that a statement was
> materially false or misleading."  Id.  The
> rule requires that the particular "'times,
> dates, places or other details of [the]
> alleged fraudulent involvement'" of the
> actors be alleged.  In re Glenfed, 11 F.3d at
> 847-48 (citation omitted).  See also Romani
> v. Shearson Lehman Hutton, 929 F.2d 875, 878
> (1st Cir. 1991); New England Data Services v.
> Becher, 829 F.2d 286, 288 (1st  Cir. 1987)
> ("[I]n the securities context, and in
> general, this circuit has strictly applied
> Rule 9(b)").

Id.

18

Reviewing the Second Amended Complaint, and with specific attention drawn to paragraphs 21 and 24,[10] the court is satisfied that plaintiffs have sustained both the particularity burden imposed by Rule 9(b) and the production burden imposed by Rule 56(c), Fed. R. Civ. P. Moreover, because the relief here sought would require the court to find, as a matter of law, that no material facts were mimsrepresented or, if so, that plaintiffs' reliance thereon was not justified, such sanction flies in the face of the preferred procedure in this circuit that disposition of litigation should be on the merits. See, e.g., Richmond v. General Motors Corp., 437 F.2d 196 (1st Cir. 1971). Accordingly,

_____

[10]These paragraphs aver as follows:

> 21. Weingart and Dinco were further advised, during the January 21, 1988[,] conversation, by defendants Levy, Gunner and Axelrod that the sale of MMI would not affect MMI's distribution business with Sears. At the time of that representation, those defendants either knew otherwise, or had no actual basis for that representation.

> 24. On or about May[] 19, 1988, Dinco and Weingart met in Montreal, Quebec, Canada, with Gunner, Levy, and Axelrod, who were acting on behalf of all defendants. During that meeting, Dinco and Weingart expressed an interest in purchasing MMI, but inquired directly about the continued business of Sears. Dinco and Weingart were reassured that the Sears business would continue as before.

Second Amended Complaint ¶¶ 21, 24.

19

defendants' motion for summary judgment as to fraudulent and negligent misrepresentation (Counts IV and V) is herewith denied.

### 3. Defendants' Motion to Strike Plaintiffs' Cross-Motion for Summary Judgment (document 95)

Defendants move the court to "strike" plaintiffs' cross-motion for summary judgment as untimely. For the reasons that follow, said motion is herewith denied.

As an initial matter, motions are not generally subject to being stricken. See, e.g., Resolution Trust Corp. v. Blasdell, 154 F.R.D. 675, 683 (D. Ariz. 1993) ("Rule 12(f), [Fed. R. Civ. P.,] does not authorize this court to strike documents other than pleadings."); Weiss v. PPG Indus., Inc., 148 F.R.D. 289, 291-92 (M.D. Fla. 1993) ("A motion is not a pleading, and thus a motion to strike a *motion* is not proper under [Rule] 12(f).").

Moreover, to the extent that plaintiffs' motion was untimely, such reason, standing alone, does not warrant defendant's suggested relief. E.g., 28 FEDERAL PROCEDURE, L. ED., § 62:574 (1984) ("court-imposed time limitation for filing motions for summary judgment contained in a pretrial order is not a bar to a later filing").

Defendants' motion to strike is accordingly denied.

## 4. Plaintiffs' Cross-Motion for Summary Judgment (document 79)

Plaintiffs have filed a document captioned "Cross Motion for Summary Judgment" which essentially seeks affirmative rulings on points they similarly raise in opposition to defendants' summary judgment motion, namely whether Count II is barred by the statute of limitations and the applicability of the state Blue Sky Laws. Cross-Motion for Summary Judgment ¶¶ 3, 4. As previously addressed herein, supra section 2, plaintiffs' federal securities claim is barred as untimely, but the claim under RSA 421-B:3 is actionable.

The two remaining paragraphs raise issues more properly addressed by medium of motion in limine. Succinctly, plaintiffs seek to bar any evidence pertaining to the integration clause of the Stock Purchase Agreement, paragraph 4, as well as a ruling on defendants' vicarious liability for the actions of their authorized representatives, paragraph 5.

Plaintiffs draw the court's attention to Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp., 910 F.2d 1540 (7th Cir. 1990), and its holding regarding integration clauses and silent contract terms. Noting that "[a] silent contract does not prevent action based on an antecedent lie," id. at 1545 (citation omitted), the Seventh Circuit panel went on to discuss the effect of this principle in relation to a contractual integration

21

clause:

> Paragraph 10 of the contract reads (in full):
>
> *Entire Agreement.* This Agreement constitutes the entire agreement between the parties, and may not be amended or supplemented except by written instrument executed by an authorized agent or officer of each of the parties hereto.
>
> As integration clauses go, this is wimpy. It makes no reference to prior "representations" and does not purport to modify ¶ 8 of the contract, which says that "[a]ll representations and warranties of the parties shall survive the closing of the transactions contemplated hereby." Paragraph 8 is not limited to written representations. Paragraph 10 implements the parol evidence rule, saying that the *agreement* is no more than what the contract says, adding that it may be modified only in writing. Astor does not seek to recover on an *agreement* at variance with the terms of the contract. It says, rather, that there was fraud in the inducement. Claims of fraud in the inducement are not blocked by the parol evidence rule. . . . We conclude that the contract does not affect Astor's ability to recover for antecedent oral fraud.

Astor, supra, 910 F.2d at 1545-46.

The Stock Purchase Agreement in issue here is similar to that in Astor, and, more importantly, dissimilar to the one defendants cite in One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988).[11] As in Astor, this court finds that the

---

[11]The parties in One-O-One expressly indicated that their "Agreement *'supersede[d]* any and all previous understandings and agreements.'" One-O-One, supra, 848 F.2d at 1286.

22

integration clause at issue[12] "implements the parol evidence rule, saying that the *agreement* is no more than what the contract says . . . ." Astor, supra, 910 F.2d at 1546. Plaintiffs' do not seek to recover on an agreement at odds with the terms of the stock purchase. Rather, they submit that certain fraudulent misrepresentations were made as part of the inducement to enter into the agreement.[13] Accordingly, paragraph 6.9 of the Stock Purchase Agreement does not impede plaintiffs' ability to recover for whatever antecedent oral fraud they may prove at trial, and defendants are hereby precluded from using said paragraph to argue otherwise. The relief sought in paragraph 4 is herewith granted.

To the extent that plaintiffs seek, via paragraph 5, a ruling establishing both liability and agency status of the individual defendants, said motion is denied as a matter properly reserved for the jury. Plaintiffs are, however, entitled to put on such evidence as may substantiate a jury finding in their

---

[12]Said clause provides, in sum, "Integration. This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof." Stock Purchase Agreement ¶ 6.9.

[13]The court notes that the Stock Purchase Agreement specifically states, "All representations and warranties of each party shall survive the Closing hereof," Stock Purchase Agreement ¶ 3.4, a statement the integration clause does not explicitly modify.

23

favor.

5.  Motion to Strike Affidavit of John A. Georges (document 96)

Defendants move to strike the affidavit of John A. Georges "because Mr. Georges was not previously disclosed in discovery and, therefore, his proffered testimony is inadmissible."  Motion to Strike at 1.

After numerous extensions, discovery formally and finally closed in this action on March 1, 1995, with final pretrial statements due April 1, 1995.  Mr. Georges is identified by plaintiffs in their Final Pretrial Statement as an individual who may be called as a witness.  Defendants seek to exclude both his affidavit and any trial testimony due to an alleged failure on the part of plaintiffs to accurately respond to propounded interrogatories and properly identify Mr. Georges or his proffered testimony.

The interrogatory herein at issue sought information regarding the identity of all persons to whom an alleged September 1991 admission on the part of Harold Levy was made or known to.[14]  Plaintiffs facially complied with said request, but

_____

[14]The substance of the alleged admission is that "all of the defendants knew at the time of the sale that Sears was intending to terminate the distribution business with MMI in the then near future."  Second Amended Complaint ¶ 47.

24

did not identify Mr. Georges because his knowledge pertained to an alleged October 1991 "confirmatory admission," rather than the alleged original admission of September.

Although narrowly drawn, almost to the point of hypertechnicality, plaintiffs' interrogatory answer is a satisfactory response to the question presented. Moreover, defendants' suggested relief--preclusion of Mr. Georges' testimony--"is a grave step, and '"by no means an automatic response . . . where failure to make discovery [is] not willful."'" Poulin v. Greer, 18 F.3d 979, 985 (1st Cir. 1994) (quoting Jackson v. Harvard Univ., 900 F.3d 464, 469 (1st Cir.), cert. denied, 498 U.S. 848 (1990) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988))). No finding of willfulness can be sustained on the basis of the evidence presently before the court.

That being said, "the court is empowered to take whatever action it deems appropriate after considering all of the circumstances surrounding the violation." Id. at 984 (citing Thibeault v. Square D. Co., 960 F.2d 239, 245 (1st Cir. 1992)). "The presence of surprise and prejudice play a central role" in determining what sanction, if any, is appropriate. Id.

As this court has herein barred plaintiffs' section 10(b) claim under the Securities Exchange Act of 1934, Mr. Georges'

25

testimony is accordingly relevant only as to the alleged misrepresentations. Defendants admittedly possess ample evidence which operates to contravene such testimony and have, in fact, argued that plaintiffs' reliance on any such statements is not justifiable. The strengths and merits of these respective positions are matters best reserved for resolution by the jury at trial.

Defendants' motion to strike is accordingly denied.

6. Motion to Strike Affidavit of Randall F. Cooper, Esq. (document 93)

Defendants move to strike the affidavit submitted by Attorney Cooper in opposition to Defendants' Motion for Summary Judgment "on the basis that it is ethically improper for Mr. Cooper to be both a witness and attorney for Plaintiffs." Motion to Strike at 1. Plaintiffs submit that the facts affirmed to in the affidavit only pertain to (1) whether plaintiffs had inquiry knowledge sufficient to trigger the one-year limitations bar of the federal securities statute and (2) the Levy admission of 1991 regarding Sears' intent to terminate the MMI contract.

Plaintiffs further submit that Attorney Cooper's testimony is unnecessary in light of the Georges testimony regarding same, see supra section 5, and accordingly have no plans to call

26

Attorney Cooper as a witness. Objection to Motion to Strike ¶ 4. Additionally, insofar as such testimony would pertain to the degree or extent of plaintiffs' knowledge of any alleged fraud in violation of the federal securities laws, certain rulings made herein renders "moot the need of the undersigned to testify before the trier of fact." Id. ¶ 5.

As the testimony of Attorney Cooper is no longer relevant to the claims still in issue, defendants' motion to strike same is herewith denied as moot.

### Conclusion

For the reasons set forth herein, the following rulings shall herewith issue:

1. Defendants' Motion for Summary Judgment (document 69) is granted in part and denied in part. Plaintiffs' claim under section 10(b) of the Securities Exchange Act of 1934 is barred as untimely raised. All other claims shall go forward to trial.

2. Defendants' Motion to Strike Plaintiffs' Cross-Motion for Summary Judgment (document 95) is denied.

3. Plaintiffs' Cross-Motion for Summary Judgment (document 79) is granted in part and denied in part. Plaintiffs' federal securities claim is barred as untimely, but their state securities claim shall go forward. Plaintiffs are entitled to

27

introduce parol evidence to establish antecedent oral fraud.  The liability of the individual defendants, and whether such liability, if so proved, is imputed to the corporate defendants, shall be resolved on the merits by the jury.

4.  Defendants' Motion to Strike Affidavit of John A. Georges (document 94) is denied.

5.  Defendants' Motion to Strike Affidavit of Randall F. Cooper, Esq. (document 93) is denied as moot.

SO ORDERED.


_____
Shane Devine, Senior Judge
United States District Court

September 26, 1995

cc:   Randall F. Cooper, Esq.
      Steven J. Kantor, Esq.
      John L. Putnam, Esq.
      Kenneth H. Merritt, Esq.
      Eugene J. Kelley, Jr., Esq.
      James P. Bassett, Esq.

28